UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZERO CARBON HOLDINGS, LLC and
FOUR THIRTEEN, LLC,

                    Plaintiffs,

        -against-

ASPIRATION PARTNERS, INC.,

                    Defendant.

Case No. 23-cv-5262

<u>**AMENDED COMPLAINT**</u>

        Plaintiffs Zero Carbon Holdings, LLC ("ZCH") and Four Thirteen, LLC ("413") (collectively, "Plaintiffs"), for themselves, by their attorneys, Foley & Lardner LLP, for their Complaint against defendant Aspiration Partners, Inc. ("Defendant" or "Buyer"), allege as follows:

## <u>NATURE OF THE CASE</u>

        1.      ZCH, a company that supports carbon credit projects that reduce greenhouse gas emissions or increase carbon sequestration, and 413, the sole member of ZCH, bring this action to stop the precipitous auction of 413's interest in ZCH by Defendant based on an improper assertion of default.

        2.      On or about February 9, 2022, the parties entered into certain agreements through which Defendant paid money to receive carbon credits to the extent that they were issued in connection with two projects in Brazil.  The payment was collateralized by membership interests in ZCH (as pledged by 413).

3.      Though Defendant has issued purported notices of default, no event of default has occurred.  Accordingly, Plaintiffs seek declaratory judgement that, among other things, as a matter of law, no event of default has occurred under the agreement between the parties.

4.      Defendant has also issued notice of a sale of the membership interest in ZCH for July 20, 2023.  Such sale of the membership interest and the subsequent change of ownership in ZCH would almost certainly cause the projects in Brazil to fail.

5.      The failure of the projects in Brazil would cause irreparable harm to the parties, the Amazon community, and the environment.  Accordingly, Plaintiffs further request an order enjoining Defendant from selling or attempting to sell the membership interest in ZCH until such time as the carbon credit project is issued and/or this action may be resolved on the merits.

## THE PARTIES

6.      Zero Carbon Holdings, LLC is a Wyoming limited liability company.  Its sole member is Four Thirteen, LLC.

7.      Four Thirteen, LLC is a Wyoming limited liability company.  Its sole member is Impacted, LP, a Delaware limited partnership.  The sole member of Impacted, LP is Tracy Norton, who is a citizen of Arizona.

8.      Accordingly, Zero Carbon Holdings, LLC and Four Thirteen, LLC are citizens of Arizona.

9.      Aspiration Partners, Inc. is a Delaware corporation with its principal place of business in California.

10.      Accordingly, Aspiration Partners, Inc. is a citizen of Delaware and California.

**JURISDICTION AND VENUE**

11.    This Court has personal jurisdiction over Plaintiffs and Defendant because the parties have irrevocably and unconditionally consented to the jurisdiction and venue of this Court in the parties' agreement.

12.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2).

13.    While the amount in controversy cannot currently be determined with certainty, it exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

**FACTS COMMON TO ALL COUNTS**

**ZCH and 413**

14.    Plaintiffs are companies that are deeply committed to doing good through conscious investing.

15.    In accordance with their respective missions, Plaintiffs engage in a "conscious capitalism" investment model.  Through this model, Plaintiffs aim to achieve financial returns while simultaneously promoting long-term environmental and social capital.

16.    Plaintiffs are driven by the notion that large-scale global issues are often solved with sustainable business strategies.  Consequently, they strive to "do well by doing good", including by making targeted investments aimed at solving environmental problems such as climate change.

17.    Plaintiffs' targeted investments include projects designed to reduce the amount of carbon dioxide in the environment, including certain "carbon credit" projects.

18.    Defendant is an experienced and sophisticated carbon credit reseller.

**Carbon Credit Projects**

19.     Carbon credit forestry preservation projects are designed to reduce greenhouse gas emissions.  A carbon credit represents the right to emit a specified amount of carbon dioxide into the environment.  Companies that receive carbon credits may use these credits to compensate for their pollution, and/or may sell excess credits to other companies with greater need.  Thus, those companies that cannot easily reduce their emissions may continue to operate, albeit at a higher financial price, while other companies are incentivized to reduce their emissions such that they are able to sell excess carbon credits for profit.

20.     Companies may be awarded carbon credits in connection with their performance of projects designed to reduce the amount of carbon dioxide in the environment.  Because these credits are transferrable, there is a significant secondary market.

**The Two Brazilian Carbon Credit Projects**

21.     ZCH and Defendant were introduced in or around December 2021.  At the time, ZCH was in the process of developing a carbon credit forestry preservation project on certain land parcels located in Amazonas and Mato Grosso, Brazil.  The project was titled the "Zero Carbon Aripuana River REDD Project" (alternately, "ZCH #1").  ZCH #1 aimed to reduce emissions derived deforestation and forest degradation in the Amazonian tropical rain forest.  When the parties first engaged in the business conversations, ZCH had just completed a feasibility report on a potential new project that contained several parcels of land located in the same region.

22.     ZCH had hired best in class service providers to perform extensive due diligence pertaining to the land that the project was intended to preserve.  The service providers concluded that the land was in a favorable condition for development of the project.

23.     Defendant participated in these diligence efforts and was given access to the service providers and their work product.

24.     Simultaneously, ZCH was developing a second project titled "Nova Aripuana REDD Feasibility Study" (alternately, "ZCH #2").

25.     In connection with ZCH #2, Plaintiffs retained a leading environmental consulting firm that specializes in enabling solutions to reduce carbon emissions (the "Firm").  The Firm prepared an extensive project feasibility report (the "Project Feasibility Report") regarding ZCH #2, which concluded that the parcels of land were well suited for development of the project.

26.     Defendant thoroughly vetted the Project Feasibility Report and conducted extensive due diligence, which included attorney investigation and communication directly with the Firm.

27.     Based on its due diligence and with a full understanding of the many risks of delayed or failed issuance, Defendant contracted with ZCH to buy carbon credits from the ZCH #1 and ZCH #2 projects (the "Approved Projects").

**The Agreement**

28.     To memorialize this arrangement, on February 9, 2022, ZCH and Defendant signed an agreement calling for ZCH to deliver 6,555,556 carbon credits to Defendant by September 30, 2024. That agreement was memorialized by a letter agreement (the "Confirmation"), which incorporates by reference the 2002 ISDA Master Agreement as published by ISDA ("ISDA Master Agreement") (together, the "Agreement").  A copy of the ISDA Master Agreement is attached hereto as **Exhibit 1**.  A copy of the Confirmation is attached hereto as **Exhibit 2**.

29.     In the event of any inconsistency between the ISDA Master Agreement and the Confirmation, the Confirmation controls.  **Exhibit 2** at 1.

5

## The Definition of Carbon Credit

30.     Pursuant to the Confirmation, Carbon Credit "[m]eans the carbon credits ***issued by the Registry*** and generated by either of the Approved Projects."   **Exhibit 2** at 3 (emphasis added).

31.     The Registry is defined as VERRA.  *Id*.

32.     VERRA is a nonprofit, nongovernmental agency tasked with auditing the Approved Projects and then issuing Carbon Credits.  VERRA manages the world's leading voluntary carbon markets program, the "Verified Carbon Standard."  The Verified Carbon Standard program is in alignment with emerging compliance markets, including the Paris Agreement.

33.     The validation and verification audit processes are critical to VERRA's programs and methodologies.  These processes are conducted by independent third-party auditors who perform rigorous assessments to confirm that projects align with program rules and methodologies. *See* https://verra.org/programs/verified-carbon-standard/.

34.     During validation, a third-party auditor approves the final description of the project. If validation is achieved, the project may be submitted for registration.  *Id*.

35.     During verification, an auditor considers the project's monitoring plan and confirms that the project has successfully reduced and/or removed harmful emissions.  *Id*.

36.     Only once verification has been completed and approved by VERRA can a project proponent request the issuance of carbon credits.  *Id*.

37.     As such, even if a project receives initial approvals to move forward, there is always significant risk that the third-party audit process will delay the credits from issuing, or that the audit process will determine that the credits cannot issue altogether.

38.    Generally, carbon credits are not considered valid for use until they have been issued by a registry such as VERRA.  VERRA's actual issuance of carbon credits is thus a fundamental prerequisite to any purported transfer of those credits.  In turn, a Carbon Credit, as defined by the Agreement, must be issued by VERRA to exist.

39.    Industry participants are well aware that carbon credits are valueless prior to issuance, and will typically consider many potential risks associated with such an investment, including environmental and geopolitical risks, before purchasing unissued credits.

40.    To date, VERRA has not issued any carbon credits in connection with the Approved Projects.  *See* https://registry.verra.org/app/projectDetail/VCS/2587.

### Delivery of the Carbon Credits

41.    Pursuant to the Agreement, ZCH was to deliver to Defendant Carbon Credits in the relevant "Physical Settlement Quantity" on or before each of two defined "Physical Settlement Dates."  **Exhibit 2**, at 2.

42.    The Physical Settlement 1 Quantity is defined as "[t]he amount of Carbon Credits ***issued by the Registry*** on each Registry Issuance date during the Physical Settlement 1 Calculation Period; *provided, however,* in no event shall the aggregate Physical Settlement 1 Quantity for all Physical Settlement 1 Dates during the Physical Settlement 1 Calculation Period Exceed 3,600,000 Carbon Credits (**the '*Period 1 Amount*')**."  *Id*. (first emphasis added).

43.    Physical Settlement 1 Dates are defined as "the earlier to occur of: (x) each date on which Carbon Credits are issued by the Registry (each a "***Registry Issuance Date***") during the Physical Settlement 1 Calculation Period; and (y) December 31, 2022 (as may be extended by up to ninety (90) days by mutual agreement of the parties, not to be unreasonably withheld)."  *Id*. (emphasis in original).

44.     The parties agreed to extend the December 31, 2022 date by three months.

45.     The Physical Settlement 2 Quantity is defined as "[t]he amount of Carbon Credits issued by the Registry on each Registry Issuance Date during the Physical Settlement 2 Calculation Period; *provided, however,* in no event shall the aggregate Physical Settlement 1 Quantity for all Physical Settlement 2 Dates during the Physical Settlement 1 Calculation Period Exceed 2,955,556 Carbon Credits (**the *'Period 2 Amount')*.**"   **Exhibit 2**, at 3 (emphasis in original).

46.     The Physical Settlement 2 Dates are defined as "the earlier to occur of: (x) each Registry Issuance date during the Physical Settlement 2 Calculation Period; and (y) the Termination Date." *Id*.

47.     The Termination Date is defined as September 30, 2024 (as may be extended by the Buyer in its sole discretion).

**The Equity Pledge**

48.     As collateral security for its performance of the obligations under the Agreement, ZCH granted Defendant a security UCC membership interest in the right to control and operate the Approved Projects.  To facilitate this arrangement, 413 pledged its membership interests in ZCH to Defendant pursuant to an equity pledge agreement dated February 9, 2022 (the "Equity Pledge Agreement").  The Equity Pledge Agreement is attached hereto as **Exhibit 3**.

49.     Pursuant to the Equity Pledge Agreement, Defendant has the right to be substituted for 413 in the event of default.

50.     As relevant here Pursuant to Section 5(a)(i) and (iv) of the ISDA Agreement:

(a) ***Events of Default***. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to

Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:

(i)*Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the First Local Delivery Day in the case of any such delivery after, in each case, notices of such failure is given to the party;…

(iv) *Misrepresentation.*  A representation (other than a representation under Sion 3(e) or 3(f) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;…

## ZCH and Defendant Learn ZCH #2 Is Not Viable

51.     In or around April of 2022, ZCH retained a Brazilian firm ("Ecofix") to complete a forest inventory and soil sampling on the parcels developed for ZCH #2.

52.     Ecofix alerted ZCH and its attorneys in or around October of 2022, when the development process for ZCH #2 was approximately sixty percent complete, that all of the parcels being used to develop the ZCH #2 project, which were previously approved by the feasibility report relied on by both parties, had boundaries which overlapped with areas designated by state governments as public park lands.

53.     Because these circumstances generally prohibit the development of carbon credit projects like the ones at issue here, this critical piece of information was something that the Firm should have – but did not – identify in its Project Feasibility Report.

54.     Upon discovery of the issues associated with the overlapping public lands, representatives from ZCH flew to Brazil to meet with government officials directly.

55.     ZCH also engaged various experts to devise proposals for the Brazilian government, including partnership and revenue share agreements, but they were ultimately unsuccessful in agreeing upon a path forward.

9

56.     Despite ZCH's best efforts, after spending millions of dollars in the development process up to that point, it concluded that ZCH #2 needed to be abandoned in its entirety.

57.     Upon this final conclusion, and after exhausting all efforts, ZCH notified Defendant of this development.

**The Issuance of ZCH #1 Is Delayed Due to Political Unrest and Environmental Conditions**

58.     Brazil held a contentious presidential election in October of 2022.  In the preceding and subsequent months (approximately June through December of 2022), the country underwent significant corresponding political and social unrest which made travel to the project areas basically impossible.

59.     Although ZCH expected the carbon credits associated with ZCH #1 to be issued in or around late Q3 2022, the turmoil surrounding the 2022 presidential election ultimately prevented the issuer's access to the land to timely complete their audit work.

60.     When it became clear that the political unrest would delay issuance of ZCH #1, Defendant and ZCH agreed to extend the Physical Settlement 1 Date from December 31, 2022 to March 31, 2023.

61.     In or around January of 2023, subsequent to the unrest surrounding the 2022 presidential election, the audit schedule was once again delayed for the ZCH #1 project as a result of low river levels preventing access to the site.

62.     ZCH continually communicated the reasons for the delay to Defendant in detail and provided back-up documentation from service providers regarding the same.  These efforts included weekly telephone calls between key ZCH and Defendant team members.

63.     ZCH also offered to make a number of materials associated with the Approved Projects available to Defendant, including: "Corrective Action Requests" (CARs) from the highly-

regarded auditing firm (Aster Global Environmental Solutions or "Aster Global") that ZCH has retained in connection with the Approved Projects; ZCH's draft and final responses to the CARs; the agreement between ZCH and Aster Global in connection with the Approved Projects; all contracts or agreements relevant to the Approved Projects; all permits, licenses and authorizations required for the current development or operation for the Approved Projects; any correspondence between VERRA and ZCH and any of their affiliates; and any information identifying local or NGO opposition to the Approved Projects.

64.    ZCH has worked tirelessly and in good faith to advance ZCH #1 as quickly as possible and despite the political and physical challenges outside of its control.  By way of example, ZCH has pressured the service providers daily to maintain and/or exceed delivery dates; chartered several private aircrafts in Brazil for auditors to visually fly over the parcels for several days to decrease the likelihood that a second site visit was necessary; and engaged additional service providers to go into the community to obtain necessary signatures.

65.    In addition, in March 2023, ZCH facilitated and funded a site visit of ZCH #1. During that visit, Defendant accompanied the auditors to ZCH #1 to observe the verification process.  ZCH facilitated this trip for Defendant in the spirit of transparency and working together towards the common goal of issuance of the project.

66.    While ZCH has acted in good faith to procure project issuance, Defendant often has not.

67.    For example, Defendant has contacted ZCH's third-party service providers over ZCH's repeated objections (and contrary to viable non-disclosure agreements), potentially placing project issuance at risk and causing much confusion in the process.  Defendant even went so far as to corner the CEO of the Firm at an ESG conference and reach out directly to ZCH's

environmental law attorney seeking privileged information. This conduct could result in reputational harm to ZCH among industry participants.

68.     Throughout these events, Defendant has assured ZCH that it remains invested in the project, and that it intends to see the project to fruition. In reliance upon Defendant's representations, ZCH has expended significant funds in an ongoing, good faith effort to achieve issuance of the credits.

69.     ZCH #1 is now in the final stages of the issuance process, and the ZCH #1 Carbon Credits are expected to issue sometime between August and October of this year.

**The Purported Notices of Default**

70.     On February 1, 2023, Defendant sent a notice to ZCH asserting that ZCH had defaulted under Section 5(a)(iv) of the ISDA Agreement in connection with certain oral representations that ZCH made regarding the Approved Projects (the "First Notice"). The First Notice is attached hereto as **Exhibit 4**. Specifically, Defendant alleged ZCH had confirmed during a January 12, 2023 phone call that a particular third party would assist in developing ZCH #2 and that Defendant "would be able to help shape the ZCH 2 Project." Ex. 4 at 1.

71.     According to Defendant, it has "evidence that ZCH was aware that the ZCH 2 project was not a viable project…, a fact that ZCH learned in August 2022…" *Id.*

72.     On March 28, 2023, Defendant sent a second notice to ZCH asserting that ZCH had defaulted under Section 5(a)(iv) of the ISDA Agreement in connection with certain oral representations that ZCH made regarding the Approved Projects (the "Second Notice") (together with the First Notice, the "Notices of Foreclosure"). The Notices of Foreclosure were substantively identical. The Second Notice is attached hereto as **Exhibit 5**.

73.     On May 10, 2023, ZCH explained to Defendant that there could be no default pursuant to Section 5(a)(iv) of the ISDA based on an oral representation made by ZCH because the Agreement plainly limits representations binding on the parties to those made in the ISDA Agreement or any Credit Support Document.  Section 5(a)(iv) of the ISDA.

74.     Implicitly recognizing that the First and Second Notices were defective and meaningless and that ZCH had not defaulted under Section 5(a)(iv) of the ISDA Agreement, Defendant then issued to ZCH a *third* purported notice on May 17, 2023.  This time, Defendant asserted that ZCH had failed to timely deliver the carbon credits pursuant to Section 5(a)(i) of the ISDA Agreement (the "Third Notice").

75.     For a number of reasons, the Third Notice is likewise defective and meaningless.

76.     Critically, ZCH's obligation to deliver carbon credits is conditioned upon VERRA's **issuance** of those credits in connection with the Approved Projects.  *See* **Exhibit 2** at 2 (defining "Carbon Credits" as "the carbon credits underlined issued by the Registry…") (emphasis added); *see also id.* ("Notwithstanding the foregoing, it is the intent of the parties that Buyer shall acquire all right, title and interest in and to the relevant Carbon Credits immediately upon issuance thereof by the Registry") (emphasis added).

77.     Because VERRA has not yet issued any carbon credits in connection with the Approved Projects, ZCH is not obligated to deliver any Carbon Credits. As such, there has been no Event of Default that could possibly entitle Defendants to dispose of the collateral, thus rendering Defendant's notice of foreclosure improper.

**The Purported Notices of Foreclosure**

78.     On May 8, 2023, Defendant delivered notice to Plaintiffs of its intent to sell (i) the membership interests issued by ZCH and (ii) the rights to each of the Approved Projects pledged

by ZCH (the "First Notification of Public Disposition").  The notice indicated that, pursuant to Section 9-610 of the Uniform Commercial Code, the sale would occur by public auction at the offices of Defendant's legal counsel.  The First Notification of Public Disposition is attached hereto as **Exhibit 6**.

79.    On May 22, 2023, Defendant sent a second notice of its intent to sell the aforementioned interests (the "Second Notification of Public Disposition").  This second notice was similar to the first, but now listed the date of the public auction as June 26, 2023.  The Second Notification of Public Disposition is attached hereto as **Exhibit 7.**

80.    On June 21, 2023, Defendant sent the Third Notification of Public Disposition.  The Third Notification of Public Disposition listed the date of the public auction as July 6, 2023.  The Third Notification of Public Disposition is attached hereto as **Exhibit 8**.

81.    On June 27, 2023, Defendant sent the Fourth Notification of Public Disposition. The Fourth Notification of Public Disposition listed the date of the public auction as July 13, 2023. The Fourth Notification of Public Disposition is attached hereto as **Exhibit 9**.

82.    On June 30, 2023, 413's representative and its counsel traveled to Irvine, California to meet with Defendant.  The parties were unable to reach a resolution at this meeting.

83.    On July 7, 2023, Defendant sent the Fifth Notification of Public Disposition.  The Fifth Notification of Public Disposition listed the date of the public auction as July 20, 2023. The Fifth Notification of Public Disposition is attached hereto as **Exhibit 10**.

84.    The parties have engaged in extensive negotiations in an attempt to resolve this dispute without the need for judicial intervention, but have ultimately been unsuccessful.


**Irreparable Harm to Plaintiff**

85.     According to the Foreclosure Notices, Defendant plans to attempt to auction (i) all of the limited liability company membership interests issued by ZCH and pledged by 413 pursuant to the Pledge Agreement, and (b) all of the rights with respect to each of the Approved Projects pledged by ZCH pursuant to the Agreement.  Such a sale would cause irreparable harm not only to Plaintiffs, but also to Defendant, the community in the Amazon where the projects are located, and to the environment more broadly because a change in ownership presented to VERRA prior to issuance of the carbon credits would almost certainly suspend or cancel the issuance process and thus prevent ZCH #1 from ever materializing at all.

86.     Meanwhile, ZCH's work in preparation for issuance is ongoing, and it is prepared to continue to put all resources necessary towards making sure ZCH #1 is issued.  Thus, a short delay of the sale will not prejudice Defendant.

## COUNT I – DECLARATORY JUDGMENT
### (VERRA's Issuance of Carbon Credits is a Condition Precedent to ZCH's Delivery)

87.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

88.     Pursuant to the Agreement, ZCH's obligation to deliver Carbon Credits to Defendant is conditioned upon VERRA's issuance of carbon credits in connection with the Approved Projects.

89.     Plaintiffs are therefore entitled to a declaratory judgment that, pursuant to the Agreement, VERRA's issuance of Carbon Credits is a condition precedent to delivery of Carbon Credits.

90.     In the absence of a declaratory judgment that VERRA's issuance of Carbon Credits is a condition precedent to ZCH's delivery of Carbon Credits, Defendant will treat the non-delivery as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets.

91.     Were Defendant permitted to treat the non-delivery of Carbon Credits as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets, Plaintiffs would suffer irreparable harm.

92.     Plaintiffs are thus entitled to an injunction against any such sale pending issuance of ZCH #1 or resolution of this action.

## COUNT II – DECLARATORY JUDGMENT
### (Failure of Condition Precedent)

93.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

94.     Pursuant to the Agreement, ZCH's obligation to deliver Carbon Credits to Defendant is conditioned upon VERRA's issuance of carbon credits in connection with the Approved Projects.

95.     VERRA has not yet issued any carbon credits in connection with the Approved Projects.  As such, the condition precedent to ZCH's duty to deliver Carbon Credits has not occurred.

96.     Plaintiffs are therefore entitled to a declaratory judgment that there has been a failure of the condition precedent to ZCH's obligation to deliver Carbon Credits as of the date hereof.

97.     Because the condition precedent to ZCH's duty to perform has not occurred, there has been no Event of Default under the Agreement.

98.     In the absence of a declaratory judgment, Defendant will treat the non-delivery as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets.

99.     Were Defendant permitted to treat the non-delivery of Carbon Credits as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets, Plaintiffs would suffer irreparable harm.

100.     Plaintiffs are thus entitled to an injunction against any such sale pending issuance of ZCH #1 or resolution of this action.

**COUNT III – DECLARATORY JUDGMENT**
**(Impossibility and Impracticability of Performance)**

101.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

102.     As a result of challenges associated with the Approved Projects, VERRA has not yet issued any carbon credits in connection with the projects.

103.     As such, any obligation on the part of ZCH to deliver Carbon Credits to Defendant as of the date hereof was rendered impracticable and impossible.

104.     The challenges were not caused by ZCH, could not have been reasonably foreseen by ZCH, and could not have been guarded against in the Agreement.

105.     Plaintiffs are therefore entitled to a declaratory judgment that ZCH's obligation to deliver Carbon Credits has been made impossible and/or impracticable to perform.

106.     Because ZCH's obligation to deliver Carbon Credits is now impossible and/or impracticable to perform, there has been no Event of Default under the Agreement.

107.     In the absence of a declaratory judgment that ZCH's obligation to deliver has been rendered impossible and/or impracticable, Defendant will treat the non-delivery as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets.

108.     Were Defendant permitted to treat the non-delivery of Carbon Credits as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets, Plaintiffs would suffer irreparable harm.

109.     Plaintiffs are thus entitled to an injunction against any such sale pending issuance of ZCH #1 or resolution of this action.

**COUNT IV – DECLARATORY JUDGMENT**

**(Frustration of Purpose)**

110.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

111.   As discussed *supra*, ZCH has been unable to deliver the Carbon Credits as of the date hereof because VERRA has not yet issued any carbon credits in connection with the Approved Projects.

112.   The challenges preventing issuance of the Carbon Credits were not caused by Plaintiffs.  Further, the challenges could not reasonably have been foreseen by Plaintiffs and could not have been guarded against in the Agreement.

113.   The parties' purpose in entering into the Agreement was to grant carbon credits to Defendant while simultaneously engaging in environmentally beneficial investment activities.

114.   Permitting Defendant to treat the non-delivery of Carbon Credits as an Event of Default would render the Agreement virtually worthless by (i) resulting in termination of the Approved Projects and, (ii) eliminating the possibility that Defendant will obtain carbon credits in connection with the projects.

115.   Plaintiffs are therefore entitled to a declaratory judgment that there has been a frustration of purpose in connection with ZCH's failure to deliver Carbon Credits as of the date hereof.

116.   Because there has been a frustration of purpose in connection with ZCH's obligation to deliver Carbon Credits, there has been no Event of Default under the Agreement.

117.   In the absence of a declaratory judgment that there has been a frustration of purpose in connection with ZCH's obligation to deliver Carbon Credits, Defendant will treat the non-delivery as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets.

118.    Were Defendant permitted to treat the non-delivery of Carbon Credits as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets, Plaintiffs would suffer irreparable harm.

119.    Plaintiffs are thus entitled to an injunction against any such sale pending issuance of ZCH #1 or resolution of this action.

**COUNT V – DECLARATORY JUDGMENT**
**(No Event of Default has Occurred)**

120.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

121.    Pursuant to the Agreement, ZCH's obligation to deliver Carbon Credits to Defendant is conditioned upon VERRA's issuance of carbon credits in connection with the Approved Projects.

122.     VERRA has not yet issued any carbon credits in connection with the Approved Projects.  As such, ZCH's obligation to deliver Carbon Credits has not yet come due.

123.    Because ZCH's obligation to deliver carbon credits has not yet come due, there has been no Event of Default under the Agreement.

124.    Plaintiffs are therefore entitled to a declaratory judgment that there has been no Event of Default in connection with ZCH's failure to deliver Carbon Credits as of the date hereof.

125.    In the absence of a declaratory judgment that no Event of Default has occurred, Defendant will treat the non-delivery as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets.

126.    Were Defendant permitted to treat the non-delivery of Carbon Credits as an Event of Default entitling it to proceed with a sale of Plaintiffs' assets, Plaintiffs would suffer irreparable harm.

19

127.     Plaintiffs are thus entitled to an injunction against any such sale pending issuance of ZCH #1 or resolution of this action.

<u>**COUNT VI – DECLARATORY JUDGMENT**</u><br>**(Defendant Has No Membership Interest in ZCH)**

128.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

129.     Pursuant to the Agreement, Defendant's membership interest in ZCH is conditioned upon an Event of Default.

130.     Because there has been no Event of Default, Defendant does not have any current membership interest in ZCH.

131.     Plaintiffs are therefore entitled to a declaratory judgment that Defendant has no membership interest in ZCH.

132.     In the absence of a declaratory judgment that Defendant has no membership interests in ZCH, Defendant will proceed with a sale of Plaintiffs' assets.

133.     Were Defendant permitted to proceed with a sale of Plaintiffs' assets, Plaintiffs would suffer irreparable harm.

134.     Plaintiffs are thus entitled to an injunction against any such sale pending issuance of the ZCH #1 or resolution of this action.

**WHEREFORE** Plaintiffs request entry of declaratory judgment and related relief in their favor and against Defendant as follows:

A.   On the First Count, a declaration that VERRA's issuance of Carbon Credits is a condition precedent to ZCH's delivery and enjoining the sale of 413's membership interest in ZCH;

B.  On the Second Count, a declaration that there has been a failure of the condition precedent to ZCH's obligation to deliver and enjoining the sale of 413's membership interest in ZCH;

C.  On the Third Count, a declaration that ZCH's obligation to deliver has been rendered impossible and/or impracticable and enjoining the sale of 413's membership interest in ZCH;

D.  On the Fourth Count, a declaration that there has been a frustration of purpose with respect to the Agreement and enjoining the sale of 413's membership interest in ZCH;

E.  On the Fifth Count, a declaration that no Event of Default has occurred and enjoining the sale of 413's membership interest in ZCH;

F.  On the Sixth Count, a declaration that Defendant has no membership interest in ZCH and enjoining the sale of 413's membership interest in ZCH;

G.  Necessary and further relief ordering Defendant to refrain from attempting to sell or transfer the collateral prior to resolution of this action;

H.  An award of costs, including reasonable attorneys' fees; and

I.  Such other and further relief as to this Court appears just and appropriate.

Dated:  New York, New York
        July 17, 2023

FOLEY & LARDNER LLP

By:  _/s/ Sara P. Madavo_
     Sara P. Madavo
     Sam M. Koch
     90 Park Avenue
     New York, New York 10016
     (212) 682-7474
     smadavo@foley.com
     skoch@foley.com

     *Attorneys for Zero Carbon Holdings, LLC*
     *and Four Thirteen, LLC*