UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>
ZERO CARBON HOLDINGS, LLC and<br>
FOUR THIRTEEN, LLC<br><br>
          Plaintiff,<br><br>
    -v-<br><br>
ASPIRATION PARTNERS, INC.,<br><br>
          Defendant.
</td><td>
Case No. 23-cv-5262-LJL<br><br><br>
**DIRECT TESTIMONY OF<br>
<u>JAY L. ROGERS</u>**
</td></tr>
</table>

1.      My name is Jay L. Rogers.  In the period April 2019 to September 2023, I served as the CEO of Plaintiff Four Thirteen, LLC, and in the period July 2020 to September 2023 as the CEO of Plaintiff Zero Carbon Holdings, LLC ("ZCH," and together with 413, "Plaintiffs").  I offer this direct testimony in support of Plaintiff's claims for a declaratory judgment, and in opposition to the counterclaims of Defendant Aspiration Partners, Inc. ("Aspiration" or "Defendant").

2.      As set forth below, there has been no default under ZCH's agreement with Aspiration, and as a result, ZCH must prevail in this action.

**The Carbon Credit Industry**

3.      Plaintiffs employ a "conscious capitalism" investment model to support the development of carbon credit projects aimed at reducing greenhouse gas emissions and generating carbon credits.

4.      A "carbon credit," in its most commonly understood form, represents one metric ton of sequestered carbon dioxide – that is, carbon dioxide that has not been emitted as a greenhouse gas.  Companies that obtain carbon credits may use them to compensate for their own carbon emissions, or they may sell excess credits to other companies.  This system is intended to

enable companies that cannot easily reduce their own carbon emissions to continue to operate, albeit at a higher financial cost of doing so. Meanwhile, other companies are incentivized to reduce their emissions because doing so enables them to sell excess carbon credits for profit.

5.  Carbon credits can be generated by "projects" that consist of identified parcels of land that are at risk of being developed in a manner that would both generate carbon dioxide emissions and result in the destruction of trees and other plant life that would absorb carbon dioxide. The "proponent" for such a project commits to preserving that land and ensuring that its beneficial carbon sequestering features are retained for as long as possible. These projects are closely analyzed and monitored to determine the amount of carbon dioxide that has been "sequestered," or not emitted into the atmosphere, if the land remains undeveloped. Each metric ton of sequestered carbon is then reflected in a carbon credit.

6.  Before any carbon credits are issued, a carbon credit issuer – in this case, VERRA – creates the standards for validation and verification of the underlying projects. In addition, during the "validation" process, a third-party auditor assesses the current status of the project as compared to a baseline established prior to project development. A project may only be submitted for issuance once third-party validation has been achieved.

7.  During the "verification" process, an auditor considers the project's "baseline" – meaning what would have occurred with the land had no carbon credit project been undertaken. It then assesses the current status of the project and monitoring plan to determine whether the project successfully reduces or removes carbon dioxide from the atmosphere. The project proponent – that is, an entity like ZCH that has identified the land, taken steps to preserve it, and placed the land in a position to generate carbon credits – can only request the issuance of carbon credits if verification has been completed and approved by the registry.

8.    Because carbon credits are transferable, there exists a significant secondary market in which they are exchanged.  Despite the risks associated with purchasing unissued carbon credits, in early 2022, many companies were attracted to such investments because once the credits issue, they were likely to be worth many multiples of the initial investment amount.

**<u>Aspiration's Interest in the Projects</u>**

9.    Defendant Aspiration holds itself out as a carbon credit reseller.

10.    As of early 2022, Aspiration was an extremely well-funded firm with the stated mission of developing, selling, and making available to investors carbon credits and pursuing other interests in sustainable projects.  Published reports existing at or around the time of Plaintiffs' negotiations with Aspiration reflect that Aspiration had raised hundreds of millions of dollars from well-known and established players in the industry.  For example, as of December 15, 2021, Aspiration had reportedly raised $315 million dollars from Oaktree Capital Management and from affiliates of former Microsoft CEO Steve Ballmer, among others.  (*See* P-X 5 at 1.)  Moreover, Aspiration associated itself with well-known public figures, and its financial backers included actors Robert Downey, Jr. and Leonardo DiCaprio.  (*Id.*)

11.    Aspiration was introduced to Plaintiffs in or around December of 2021, at which time ZCH was in the process of developing the "Zero Carbon Aripuana River REDD+ Project" ("ZCH #1"), which was based on certain parcels of land located in Brazil.  Aspiration expressed interest in investing in a project so that it could obtain certain carbon credits it hoped would be issued if the project were successful.  When the parties first engaged in these conversations, ZCH had just completed a feasibility report on the project.  A feasibility report is generated by a third-party service provider, and it generally assesses and reports on whether the proposed project can support the issuance of carbon credits.  Here, the feasibility report was a positive one.

12.     At the same time, ZCH was also developing a second project called the "Nova Aripuana REDD Feasibility Study" ("ZCH #2," and together with ZCH #1, the "Approved Projects") based on a feasibility report prepared by a firm known as BMO Radicle, which also prepared the feasibility report for ZCH #1.  At the time that ZCH #1 and ZCH #2 were undergoing development, BMO Radicle was an industry-leading environmental consulting firm that specialized in enabling methods to reduce carbon emissions.  BMO Radicle was highly respected in the sustainability advisory services space.

13.     Plaintiffs permitted Aspiration to engage in its own due diligence of both ZCH #1 and ZCH #2 prior to formalizing its investment.  We put Aspiration in touch with BMO Radicle and other service providers, and we answered any questions that Aspiration had about the projects. I do not recall Aspiration ever asking for any information that we did not ultimately provide.

**The Contract Negotiations**

14.     I was personally involved in, and led, the negotiation of the Agreements that were reached between ZCH and Aspiration in February 2022.  I was also the only individual from ZCH and 413 who was personally involved in the negotiations and who was authorized to reach agreements with Aspiration.  Javier Rocha, who served as our in-house counsel, participated in some conversations and communications, but he was not authorized to, and did not, reach any substantive agreements with the other side.  Instead, his role was to assist in documenting the agreements that had been reached by others.

15.     The central features of our agreement were ultimately reflected in a document referred to as a "Letter Confirmation," but which I will refer to herein as simply the "Agreement." (P-X 1.)

16.     Based upon my recollections of those negotiations, and based upon the final terms of the Agreement, ZCH is not presently in default, and Aspiration therefore does not have the right to foreclose on the collateral granted to it under the Agreement.  That is, because our central obligations under the Agreement were to (i) use our "good faith efforts to diligently develop and operate the Approved Projects and ... take all actions reasonably required to cause the Registry to issue the Carbon Credits as soon as possible" (P-X 1 at 7, § 5(d)); and to (ii) deliver carbon credits to Aspiration if they were issued by VERRA.  Our obligation, more specifically, was to deliver the "amount of Carbon Credits issued by the Registry on each Registry Issuance Date during the Physical Settlement 1 Calculation Period[.]" (*Id.* at 2, "Physical Settlement 1 Quantity.")  We did not take on an independent obligation to make sure that the credits were actually issued.

17.     ZCH satisfied its obligations under the Agreement.

18.     The negotiations took place in significant part between me, on the one hand, and Robert Lee of Aspiration, on the other.  By late January 2022, Mr. Lee and I had negotiated most of the key terms of the deal, and those terms were reflected in the first written draft that was sent to us by Mr. Lee on January 24, 2022.  (*See* P-X 6.)

19.     Notably, it was Aspiration that drafted the terms of the Agreement.  At the time, Aspiration was represented by Sidley Austin LLP, a well-known and sophisticated law firm.

20.     That initial draft reflects the very basic terms of the Agreement, which never changed:  ZCH agreed to deliver "Carbon Credits," but they were defined as "the carbon credits issued by the Registry," or VERRA, "and generated by either of the Approved Projects." (P-X 1 at 3, "Carbon Credits.")  In other words, ZCH only agreed to deliver Carbon Credits *if they were issued by VERRA*.  Indeed, under the terms of the Agreement ZCH was limited to delivering the specific credits that might be issued by VERRA in connection with the then-existing "Approved

Projects."  Every obligation in the Agreement ultimately refers to and relies upon this definition of Carbon Credits, so that our obligation is and was always only to deliver "the carbon credits issued by the Registry and generated by either of the Approved Projects."  (*Id.*)

21.    This was consistent with our general obligation under the Agreement:  If VERRA issued credits, we were obligated to ensure that a certain number of those credits were delivered to Aspiration.  We could not, for example, sell them all to others or take advantage of the prices then existing in the market to sell them for our own benefit.  We even agreed that Aspiration would obtain title to Carbon Credits as soon as (but not before) they were issued:  "Notwithstanding the foregoing, it is the intent of the parties that Buyer shall acquire all right, title and interest in and to the relevant Carbon Credits *immediately upon issuance thereof by the Registry*."  (P-X 1 at 2, "Physical Settlement" (emphasis supplied).)  This way, we could not sell them or give them to others without technically giving away Aspiration's property.

22.    Notably, the "Approved Projects" were meant to exist and to generate Carbon Credits for approximately thirty years.  If successful, they were expected to generate many, many millions of Carbon Credits.  We only agreed to provide a small subset of those expected credits to Aspiration.

23.    I am aware that Aspiration's attorneys have suggested in this case that Aspiration never would have agreed to pay nearly $30 million dollars if they were only receiving the chance to receive Carbon Credits in the event that they were issued by VERRA.  But that is what Aspiration did, and under the circumstances that existed in early 2022, it was a perfectly rational decision for the following reasons:

24.    *First*, Aspiration had negotiated an excellent – very low – price for the Carbon Credits that it was hoping to receive.  In the first week of February 2022, for example, the "spot"

price for a Carbon Credit was more than fourteen dollars. Yet under the terms of our Agreement, Aspiration was purchasing the ability to receive up to 6,555,556 Carbon Credits for a total of $29.5 million dollars. Thus, Aspiration was paying only *$4.50 per credit* – a massive discount. Especially given that the price of a carbon credit was then expected to increase substantially for the next few years, this was a wonderful deal for Aspiration.

25.    *Second*, even though $29.5 million is a significant amount of capital, as I noted above, Aspiration was, at that time, very well-funded and energetically looking for places to invest. Contemporaneous reports indicated that Aspiration was funded with more than $300 million dollars of capital to invest, and that as of December 2021, it was expecting to receive net proceeds in excess of $700 million dollars. (*See* P-X 5 at 1.) During that period, and in connection with a contemplated SPAC transaction between Aspiration and an entity known as InterPrivate III Financial Partners Inc., Aspiration was valued at *$2.3 billion dollars*. (*Id.*) Thus, $29.5 million dollars was not, in the scheme of things, such a significant amount of capital for Aspiration to invest, especially on the excellent terms described above.

26.    *Third*, at the time that the deal was negotiated, all of the Parties believed that it was very likely that the Carbon Credits would be issued in the relatively near future – within the next twelve to twenty-four months. Accordingly, from Aspiration's standpoint, it was making a large investment in a market that seemed to be primed for massive profits, with not much risk at all.

27.    And the proof of these facts is that, when ZCH threatened to walk away during the negotiation, and told Aspiration that it had the option to simply wait until Carbon Credits had already been issued and buy them at that time, Aspiration rejected this option and instead agreed to proceed under the terms of the Agreement as structured above.

28.     The following is the text of an e-mail that I sent to Joe Sanberg and Robert Lee during the negotiation period:

> I thought it might make sense for you and I to jump on a call to discuss this transaction. After spending considerable time over the past couple of months with Rob and his team on the terms of a transaction, I was asked to get on a call this morning [with other Aspiration parties] to ask for additional due diligence and to add some stipulations in the transaction which may not be necessary. I understand they are coming into this late, but it's really confused what is a very straightforward proposition to pre-purchase credits at a 70% discount from current market. ***If Aspiration wants absolutely zero risk then we can simply wait until issuance and pay current market price.*** This was already a below market deal when Matt first showed it to you last year. Since the price of carbon as steadily increased over the past few months it is now significantly below market.
>
> The market today is trading REDD+ voluntary credits at $14.10 with December futures well over $15[.]

(P-X 10 at 3-4 (emphasis supplied).)

29.     In response to this email, Aspiration made clear that it wanted to proceed with the transaction as it had then been negotiated. The simple fact is that Aspiration knew that it had struck an extremely good deal, and wanted to preserve that position. It now wants to re-trade that deal because the carbon markets have suffered reversals and because unforeseen events in connection with the Approved Projects negatively impacted the issuance of carbon credits.

30.     And although Aspiration made many additional demands over the next few days – with respect to the form of any collateral, rather than the circumstances under which a default would occur – ZCH rejected most of them.

31.     For example, at various points, Aspiration took the position that any money that it paid to ZCH must remain in an escrow or trust account, and could only be spent with Aspiration's approval. (*See* P-X 10 at 3.) ZCH rejected that demand, and Aspiration conceded the point. (*See*

*id.* at 2.) In addition, Aspiration demanded that the collateral include a direct ownership interest in ZCH's parent entity, 413, thereby giving Aspiration an interest in projects aside from the Approved Projects. We rejected that position as well. (P-X 25 at 1; *see also* P-X 27.)

32.    In this connection, I have been informed that Mike Shuckerow, Aspiration's in-house counsel, has suggested that Aspiration negotiated for, and obtained, collateral in ***all*** of 413, and that it obtained a "blanket lien" on 413's assets. That is simply untrue. Aspiration made demands for that type of collateral, but ZCH and 413 did not agree. Instead, Aspiration's collateral was limited to ZCH's interests in the Approved Projects, *and 413's interest in ZCH*:

> As collateral security for the prompt and complete performance when due of their respective obligations under this Confirmation, (i) Seller hereby grants to Buyer a security interest in all of its respective rights with respect to each of the Approved Projects, in each case, including without limitation all rights to control and operate project activities in accordance with Seller's status as Project Developer and its entitlement to up to 8,522,223 Carbon Credits (in each case, whether held by contract or as a partner or limited liability company member or stockholder or other arrangement), wherever located, whether now owned or hereafter acquired, and all proceeds and products thereof and (ii) Four Thirteen, LLC, a Wyoming limited liability company ("Member") hereby pledges to Buyer all ***limited liability company membership interests in Seller (the "Membership Interests")*** (clauses (i) and (ii), collectively, the "Collateral")[.]

(P-X 1 at 5, § 4 (emphasis supplied).)

33.    Ultimately, therefore, Aspiration agreed to proceed with very little in terms of collateral. Aspiration agreed to, and was granted: (i) the right to foreclose upon only those projects underlying our Agreement (including 413's interest in ZCH, which held only those two projects); and (ii) a specified number of additional Carbon Credits in excess of the amount that we agreed to deliver upon issuance. But even those additional "Carbon Credits" were as defined in the Agreement, and therefore they had to first be issued by VERRA, and generated by the Approved Projects that were the subject of the Agreement.

34.     Moreover, during these later conversations relating to the nature of potential collateral, we did not discuss – and did not renegotiate – the circumstances that would constitute a default. That is why none of the material terms of the Confirmation aside from describing the nature of the collateral changed during these discussions.

35.     During these later discussions, more specifically, Aspiration never said that ZCH had to take on the obligation to deliver credits even if not issued, and we never agreed to take on any obligation that was not in the written documents.

**The Reversionary Interest**

36.     In addition, Aspiration ultimately agreed to ZCH's demand that, even if Aspiration took control of the projects at any point, that control would revert to ZCH once Aspiration obtained the number of Carbon Credits that had been agreed to.

37.     That right to a reversionary interest is reflected in two locations in the Agreements. The first reference is found in the last sentence of the paragraph in the Agreement relating to Collateral, which reads: "Upon Seller's successful transfer of the Total Quantity of Carbon Credits to Buyer, Buyer shall promptly release any liens or encumbrances and, at the sole cost and expense of Seller, execute and deliver such further instruments and documents and take such further actions as Seller may reasonably request to release any encumbrances or liens." (P-X 1 at 6, § 4.)

38.     The second reference can be found in the Equity Pledge Agreement, which reads as follows: "The proceeds of any sale of the Parent Pledged Collateral sold pursuant to Section 8 hereof shall be applied by the Buyer towards payment of the Obligations in the manner set forth in Clauses 4 and 5 of the Confirmation with respect to the Pledged Guarantor Securities." (P-X 2 at 9, § 9.)

39.     Accordingly, even if this Court were to conclude that there was a default, and that Aspiration had the right to control the projects, that right is subject to ZCH's right to recover the project once a sufficient number of credits are issued.

**Termination**

40.     Finally, the plain terms of the Agreement reveal that there is only one meaningful deadline, and that is September 30, 2024.  That date is defined as the "Termination Date."  It is also specified as the date by which the "Total Quantity" of "Carbon Credits" – again, only if and when issued by VERRA – must be delivered to Aspiration.  Accordingly, if September 2024 arrives, and no Carbon Credits have been issued, then, by its terms, the Agreement "terminates" – meaning that no party has any further obligations.  But the Agreement does not require that any funds be returned upon termination, or that any other event occur, if no credits have been issued by that date.

41.     As a result, under no circumstances – even if Aspiration's interpretation of the Agreement were otherwise correct – could ZCH be found to be in default at any time prior to September 30, 2024.

**The Court's Ruling**

42.     In its ruling denying Aspiration's motion to dismiss, this Court expressed the view that ZCH's position was to some extent undercut by the existence of the two separate delivery periods in the Agreement.  (December 27, 2023 Memorandum and Opinion at 12.)  But the fact is, those two delivery dates were not a meaningful part of the overall agreements between the parties. Those provisions were originally inserted at a time in which Aspiration was asking that ZCH keep money in escrow, and Aspiration wanted the option to request a release of money, or other credits, from the escrow at different dates if Aspiration did not receive the Carbon Credits by that time.

(P-X 26 at 1.)  When it made the request, Aspiration referred to this as "settling" the credits at different times.  But ZCH did not ever agree to keep any money in escrow, or any process by which a credit could be exchanged for cash, or other credits, or any process of "settlement," and as a result, those dates ultimately played very little role in the negotiations.  But more importantly, the plain terms of those provisions imposed little, if any, additional obligations on ZCH, and certainly did not impose a minimum number of credits that were required to be issued in any particular period.

43.     The provisions themselves read as follows:

> Physical Settlement 1 Dates: Means the earlier to occur of: (x) ***each date on which Carbon Credits are issued by the Registry*** (each a "*Registry Issuance Date*") during the Physical Settlement 1 Calculation Period; and (y) December 31, 2022 (as may be extended by up to ninety (90) days by mutual agreement of the parties, not to be unreasonably withheld).

> Physical Settlement 1 Quantity: The amount of Carbon Credits ***issued by the Registry on each Registry Issuance Date during the Physical Settlement 1 Calculation Period***; *provided, however,* in no event shall the aggregate Physical Settlement 1 Quantity for all Physical Settlement 1 Dates during the Physical Settlement 1 Calculation Period exceed 3,600,000 Carbon Credits (the "*Period 1 Amount*").

(P-X 1 at 2 (emphasis supplied).)

44.     As is plain from the text, these provisions required that ***only if*** Carbon Credits were issued during the specified period, then ZCH was obligated to deliver ***up to*** 3,600,000 Carbon Credits to Aspiration.  The provisions do not impose a minimum amount of Carbon Credits that ZCH was obligated to provide, and do not impose an independent obligation upon ZCH to ensure that Carbon Credits are actually issued.  Nor could ZCH actually do so, as Aspirations knew. Instead, the Agreement simply states that if more than 3,600,000 Carbon Credits are issued during that period, ZCH was obligated to deliver only that many to Aspiration.

45.     The Court also indicated that ZCH's position is undercut because the transaction was structured as a "prepaid forward contract" and not an "option."  (December 27, 2023 Memorandum and Opinion at 10-11.)  But it was Aspiration that unilaterally chose to use the "prepaid forward" transaction format, and there were no discussions or negotiations about that format, and most importantly, that format does not override the plain terms that were agreed to.  Furthermore, it is not ZCH's position that this transaction was an "option" – in the sense that Aspiration merely bought the right to purchase Carbon Credits at a particular price in the future if it so chose.  Instead, Aspiration bought the right to receive Carbon Credits that were expected, if and when issued, to be many times more valuable than the price that Aspiration had paid for them.  And ZCH was obligated to turn over a specific number of Carbon Credits if that number of Credits were ever issued during the Term of the Agreement.  Thus, the transaction was not an "option."

46.     The Court also suggested that, if ZCH is correct, that would render superfluous the language that provides "[f]or the avoidance of doubt, Seller [ZCH] shall cause the Total Quantity to be delivered to Buyer [Aspiration] during the Term hereof."  (P-X 1 at 2, "Physical Settlement.") But with respect, that is not the case – in fact, that language is perfectly consistent with ZCH's position.  As set forth above, the interim deadlines did not impose much of an obligation on ZCH at all – they required only that, *if* Carbon Credits were issued on certain dates during those periods, ZCH was obligated to deliver them to Aspiration, but only *up to* 3,600,000 in the first period, and *up to* 2,955,556 in the second period.  They simply do not impose any minimum credit-delivery obligations on ZCH, and instead require that ZCH use "good faith efforts to diligently develop and operate the Approved Projects."  (*Id.* at 7, § 5(d).)

47.     The "[f]or the avoidance of doubt" provision – which was added late in the drafting history – merely acts as "belts and suspenders" language to say that, even if no Carbon Credits are

issued in the First Physical Settlement Period, and therefore none are delivered, ZCH would still need to deliver the Total Quantity if all of the Carbon Credits were issued during the Second Physical Settlement Period.  Therefore, the "[f]or the avoidance of doubt" provision is entirely consistent with ZCH's position.

48.    It is also worth noting that if Aspiration's position were correct – meaning, if ZCH had a separate obligation to deliver 3,600,000 Carbon Credits by the end of 2022, and then a separate obligation to deliver the balance by September 2024, then that sentence *would also be superfluous*.  Therefore, the existence of that language does not weigh in favor of either outcome.

49.    What is more important is that, as the Court observed, Aspiration's position requires the Court to read into the Agreement an obligation that simply does not exist.  (December 27, 2023 Memorandum and Opinion at 10-11.)  Settled law does not authorize the Court to do this.

### ZCH's Diligent Efforts to Secure Issuance

50.    As noted above, ZCH was obligated to make good faith efforts to have credits issued, and deliver a specified number of credits if and when they were issued.

51.    ZCH more than satisfied this obligation by, among other things, hiring industry-leading service providers and consultants, investing numerous hours into the development of the Approved Projects, and spending tens of millions of dollars in an effort to get the Carbon Credits issued.

52.    ZCH has worked with an array of service providers, attorneys, professionals in the field of sustainability consulting, and other personnel in an effort to get credits issued.  These extensive activities are reflected in documents produced by the Parties in this case, some of which are appended hereto as P-X 28, P-X 29, P-X 30.  Service providers we have used in connection with the Projects include:  Earthood Services, EcoSecurities; Nature Bank; the Earth Innovation

Institute; Radicle; EcoFix; FAS; Aster Global; the Vieira Rezende Law Firm; the Resilient Law Firm; the Carlton Fields Law Firm; ClearBlue Markets Ltd.; and others. These service providers devote significant resources to assessing the status of the project, assisting ZCH in making its submissions to the VVB and to VERRA, and responding to the questions or issues that the VVB or VERRA raises. I was personally involved in overseeing and doing everything ZCH reasonably could do in order to make the Approved Projects successful.

53.    On December 15, 2022, I sent to Robert Lee and Tracy Bain of Aspiration the documents forming the basis for the final project design document (the "PDD") to be submitted to VERRA. (P-X 14 at 1.) And on December 19, 2022, ZCH uploaded these and other related documents to VERRA. These documents reflect thousands of hours of work and devoted resources, and represent a major milestone in the process of obtaining the issuance of credits.

54.    And although the project known as ZCH #2 ultimately became unworkable, ZCH did everything it could to try to make that project viable.

55.    In or around April 2022, ZCH retained a Brazilian firm called Ecofix Natural Capital to complete forest inventory and soil sampling on the parcels of land comprising ZCH #2.

56.    In or around August of 2022, when the development process for ZCH #2 was approximately sixty percent complete, Ecofix Natural Capital notified ZCH that all seven of the land parcels comprising ZCH #2 were overlapped by public park areas designated by state governments. The Radicle Project Feasibility Report had failed to identify this critical piece of information.

57.    Upon receiving this news, Plaintiffs arranged to fly to São Paulo, Brazil for several days to meet with legal counsel, landowners, environmental service providers, government officials, and others for the purposes of trying to resurrect the ZCH #2 project. We thoroughly

explored any options to change the boundaries of the ZCH #2 project and/or work with the government to solve the issues that had arisen from the reports received from Ecofix Natural Capital.  These meetings were held in the offices of Vieira Rezende and included myself, Joe Gagliano, Javier Rocha and Pat McCalla from my team.   Other attendees included Robert Macaulay from Carlton Fields; Lucia Aragao, Ewerton Oliveira, and Pietro Diaz of Vieira Rezende Advogados; Roberto Strumpf, Elisa Guida and Lucas Adair from Radicle; Breno Figueiredo and Marco Antonio Fujihara of Infrapar Sustainability Ltda.; Marcelo Donnini Freire, the Former National Secretary for Amazon and Former National Secretary for Climate and International Affairs in the Federal Government of Brazil; Anderson Oliveira Alexandre from MidiaGEO Grupo LTDA; and Ana Luci Grizzi, the Vice Coordinator of the Sustainability Commission of the Instituto Brasileiro de Governanca Corporativa.

58.     After substantial efforts by ZCH in searching to find options to continue the project development, ZCH #2 ultimately had to be abandoned as a result of the issues associated with the overlapping government land.  This same issue prevented carbon credits from being issued in connection with that project.  Plaintiffs informed Aspiration about this development via a documented letter detailing the chronology of events, how ZCH was informed, and how ZCH attempted to find solutions.  (*See* P-X 28.)

59.     Although the Parties expected the carbon credits associated with ZCH #1 to be issued in or around late Q3 2022, several key political and other events significantly delayed their issuance.

60.     In October 2022, Brazil held a contentious presidential election that was preceded and followed by significant social and political unrest in the approximate period June-December

2022. Turmoil surrounding the Brazilian presidential election prevented the issuers access to the land to timely complete audit work.

61.    When it became clear that the political unrest would delay issuance of ZCH #1, ZCH and Aspiration agreed to extend the Physical Settlement 1 Date from December 31, 2022 to March 31, 2023.

62.    However, in or around January of 2023, the issuer's audit was again delayed, this time by low water levels in the rivers that prevented access to the ZCH #1 site. ZCH again promptly notified Aspiration of these events as well.

63.    In addition, after our Agreement with Aspiration was signed, a number of press reports called into question the Carbon Credit verification process and other aspects of the Carbon Credit industry. In my view, that is partly what caused VERRA to slow down the issuance of credits and to make the standards more difficult to meet.

64.    Upon recognizing delays associated with the Approved Projects, ZCH timely informed, and worked diligently with, Aspiration to clear a path forward. These efforts included conducting weekly telephone calls with Aspiration as well as facilitating and funding a Brazil site visit for two of Defendant's team members on or around March 23, 2023, during which the team members were enabled to take various measurements, speak directly with the auditors, and take all field samples that they requested.

**Conclusion**

65.    For all of the reasons I have expressed above, the Court should conclude that ZCH has complied with its obligations under the Agreement, and render judgment in favor of ZCH and 413.

Dated: April 2, 2024
       New York, NY

_____
Jay L. Rogers