UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/1/2024__
```

----------------------------------------------------------------------X
                                   :

ZERO CARBON HOLDINGS, LLC and FOUR     :
THIRTEEN, LLC,                                 :

               Plaintiffs,     :           23-cv-05262 (LJL)
                                :

        -v-                   :        OPINION AND ORDER
                                :

ASPIRATION PARTNERS, INC.     :
                                :
              Defendant.     :
----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Zero Carbon Holdings, LLC ("ZCH") and Defendant Aspiration Partners, Inc. ("Defendant" or "Aspiration") are parties to a prepaid forward transaction for the sale of carbon credits, and ZCH's sole member, Plaintiff Four Thirteen, LLC ("413," and together with ZCH, "Plaintiffs") and Aspiration are parties to a related Equity Pledge Agreement, securing ZCH's performance. Plaintiffs bring this action against Defendant for a declaration that ZCH is not in breach of its obligations under the prepaid forward agreement (or that its performance has been excused). Dkt. No. 35. Defendant counterclaims for breach of contract, and requests that the Court dismiss Plaintiffs' claims and instead enter judgment in Defendant's favor on its breach of contract counterclaim, declaring that a default has occurred due to Plaintiffs' failure to deliver 3.6 million carbon credits as required by the agreements, and declare that such default entitles Aspiration to exercise its collateral rights. Dkt. No. 46.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## PROCEDURAL HISTORY

ZCH and 413 instituted this action on June 21, 2023.  Dkt. No. 5.[1]  On July 17, 2023, Plaintiffs filed an amended complaint, Dkt. No. 8, and a proposed temporary restraining order, seeking to restrain Aspiration from proceeding with its planned foreclosure sale, Dkt. No. 9.  In response, Aspiration agreed to a standstill in its foreclosure proceedings until the Court convened a full evidentiary hearing and ruled on the motion for a preliminary injunction.  Dkt. No. 11.

Plaintiffs filed a second amended complaint on July 24, 2023, Dkt. No. 16,[2] which Defendant moved to dismiss on September 21, 2023, Dkt. Nos. 25–26.  By Order of October 25, 2023, and on consent of Defendant, the Court permitted Plaintiffs to file a third amended complaint.  Dkt. Nos. 33–34.  On November 2, 2023, Plaintiffs filed a third amended complaint, asserting seven claims and seeking declaratory relief.  Dkt. No. 35.  On December 27, 2023, the Court issued a Memorandum and Order denying Defendant's motion to dismiss.  Dkt. No. 43.  On January 10, 2024, Defendant filed counterclaims against Plaintiffs for breach of contract and a declaratory judgment in its favor.  Dkt. No. 46.

The Court held a bench trial on April 10 and April 11, 2024.  The parties agreed to submit their direct testimony by declaration.[3]  *See* 4/10/2024 Minute Entry.  Plaintiffs presented the testimony of Jay Rogers, the former Chief Executive Officer of ZCH,[4] and Lucia Aragao,

---

[1] Plaintiffs attempted to file the complaint on June 21, 2023, but it was rejected for a filing error.  *See* Dkt. No. 1.  The complaint was accepted for filing on June 22, 2023.  Dkt. No. 5.

[2] The second amended complaint was addressed exclusively to what Defendant had identified as Plaintiffs' errors in pleading diversity jurisdiction.

[3] "So long as all parties consent, a district court may make findings of fact and conclusions of law on the written record alone."  *689 Eatery Corp. v. City of New York*, 2024 WL 519967, at *25 n.28 (S.D.N.Y. Feb. 9, 2024) (citing *Pristine Jewelers NY, Inc. v. Broner*, 567 F. Supp. 3d 472, 474 n.1 (S.D.N.Y. 2021) and *Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142–43 (2d Cir. 1998)).

[4] Rogers's employment was terminated in September 2023.  Trial Tr. at 8; Rogers Dep. Tr. at 13:6–14.

Plaintiffs' legal counsel in Brazil.[5]  Defendant presented the testimony of Michael Shuckerow, the Chief Operating Officer and Chief Legal Officer of Aspiration, and Robert Lee, presently Aspiration's Chief Carbon Officer and, at relevant times during the contract negotiations, a manager or director at Aspiration.  In addition, each side designated as trial testimony portions of depositions taken during discovery.  *See* Dkt. No. 70.  All four of the witnesses were subject to cross-examination at the trial.

## FINDINGS OF FACT

This case involves a dispute over an agreement to deliver carbon credits.  Plaintiffs ZCH and its parent 413 are companies that invest in carbon credit projects, which aim to reduce greenhouse gas emissions or increase carbon sequestration and thereby reduce the amount of carbon dioxide in the atmosphere.[6]  Dkt. No. 35 ¶¶ 1, 19; JX 1 ¶ 3.

Defendant Aspiration describes itself as a "climate action company," Dkt. No. 64 at 1, that aims to help companies achieve their emissions reduction goals, JX 4 ¶ 2.  To do so, Aspiration sources, invests in, and monitors carbon removal projects around the world, and curates a large portfolio of carbon credits that it then resells.  *Id.*; JX 1 ¶ 9.

Aspiration and 413 are parties to a prepaid forward agreement, documented through an International Swaps and Derivatives Association Master Agreement ("ISDA Agreement"), and a Confirmation Letter ("Confirmation") and that, as described further *infra*, required ZCH to deliver carbon credits issued by a carbon credit registry and generated by one of two approved projects in Brazil (the "Approved Projects") to Aspiration on two separate physical installment

---

[5] Defendant moved *in limine* to preclude the expert testimony of Aragao.  Dkt. No. 56.  The Court reserved judgment on the motion to exclude the testimony of Aragao and now resolves Defendant's motion to exclude Aragao's testimony in this Opinion and Order.

[6] Carbon sequestration refers to "carbon dioxide that has been 'sequestered,' or not emitted into the atmosphere."  JX 1 ¶ 5.

dates in exchange for a prepayment of $29.5 million.  *See* Dkt. Nos. 35-1, 35-2.  Aspiration and

413 are also parties to an Equity Pledge Agreement, pursuant to which 413 pledged its ownership

interests in ZCH as security for ZCH's obligations under the Confirmation, which would enable

413 to exercise all of ZCH's powers with respect to the Approved Projects in the event that ZCH

failed to make the deliveries required by the prepaid forward agreement.  Dkt. No. 35-3.  ZCH

did not deliver any carbon credits to Aspiration on the first physical installment date of March

30, 2023 (which was extended from December 31, 2022).

   In this lawsuit, Plaintiffs claim that they had no obligation to deliver carbon credits for

failure of a condition precedent, and that they were relieved from performance under the

doctrines of impossibility, impracticability, and frustration of purpose.  *See* Dkt. No. 35 ¶¶ 90–

145.  They seek a declaration that no event of default has occurred and that Defendant is not

entitled to the relief that follows from default.  *Id.*  For its part, Defendant Aspiration claims that

ZCH's failure to deliver carbon credits on the first physical installment date was a breach of

contract, giving rise to an event of default, and that it is entitled to step in for ZCH to run the

Approved Projects.  *See* Dkt. No. 46.

   The Court first describes the voluntary carbon credit market and the projects at issue in

this lawsuit.  It then describes (1) the negotiations between the parties; (2) the terms of the

agreements between the parties; and (3) the post-signing conduct of each party.

## I.     The Carbon Credits Market and the Approved Projects

   "A carbon credit represents the right to emit a specified amount of carbon dioxide into

the environment."  Dkt. No. 35 ¶ 21.  Some carbon credits are traded on compliance markets

mandated by governments where countries or companies are given limits on emissions.  *See,*

*e.g.*, Samuel L. Brown, *Carbon Markets and Carbon Offsets*,  36-SPG Nat. Res. & Env't 56, 57

(2022).  By contrast, voluntary carbon credits, at issue here, are intended to permit organizations

which seek voluntarily to compensate for or neutralize emissions not yet eliminated or meet carbon reduction goals to achieve those aims not by reducing their own emissions, but by financing projects of others that avoid or reduce emissions from other sources or that remove carbon dioxide from the atmosphere. *Id.*; Michael P. Vandenbergh et al., *Micro-Offsets and Macro-Transformation: An Inconvenient View of Climate Change Justice*, 33 Harv. Envtl. L. Rev. 303, 304 (2009). Each carbon credit represents a specified amount of carbon that is not emitted into the atmosphere. Dkt. No. 35 ¶ 21; JX 1 ¶ 4; Sarah Everhart, *Growing Carbon Credits: Strengthening the Agricultural Sector's Participation in Voluntary Carbon Markets Through Law and Policy*, 31 N.Y.U. Envtl. L.J. 65, 68 (2023). A large secondary market exists for the exchange of voluntary carbon credits. JX 1 ¶ 8. Companies that purchase carbon credits can use them to meet their own carbon goals or sell them to other companies who have carbon goals or who otherwise desire to participate in the market. Dkt. No. 35 ¶ 21; JX 1 ¶ 4.

To have value on the voluntary carbon market, carbon credits generally must be approved and issued by a reputable credit verification register. *See* Dkt. No. 35 ¶¶ 35, 40; Trial Tr. at 235. The registries purport to review an emission reduction or elimination project and verify the project has complied with the registry's standards and resulted in a quantified reduction or elimination of carbon dioxide. *See* JX 1 ¶ 6. Once a project has been certified as complying with a registry's standards, project developers are issued Verified Carbon Units ("VCUs") that can be traded on the voluntary carbon market. *See* JX 2 ¶ 5; Trial Tr. 234. The largest issuer of voluntary carbon credits is VERRA, which is an independent standards organization operated as a non-profit. Dkt. No. 35 ¶ 34.[7]

---

[7] Each registry sets and maintains its own standards. *See* JX 1 ¶ 63. VERRA made its standards more rigorous in 2023. *Id.*; Trial Tr. at 228; *see also* Gagliano Dep. Tr. at 92:11–94:06.

There are several different types of carbon credits that are bought and sold on the voluntary carbon credit market.  Trial Tr. at 70, 212.  The credits are categorized by the specific environmental purpose they further, and include, *inter alia*, afforestation, reforestation and restoration carbon credits, which establish or increase vegetative cover, household device carbon credits, which reduce the amount of biomass needed for fuel by providing items such as clean cook stoves into the developing world, agriculture carbon credits, which improve soil quality and generate carbon sequestration through rotational grazing, *id.* at 212, and "REDD+" credits, at issue here, generated by projects that "reduc[e] emissions from deforestation and forest degradation" in developing countries, JX 2 ¶ 2.  Carbon credits can also be certified by registries as meeting a climate, community and biodiversity ("CCB") standard, which confers additional value.  *Id.*; Trial Tr. at 234.

Developers of carbon credit projects can apply to VERRA for issuance of carbon credits associated with specific areas of land.  JX 2 ¶ 5; *see* JX 1 ¶ 5.  In order to obtain VERRA verification, a project developer will prepare a project feasibility report verifying that the project is in fact a feasible approach to securing the issuance of carbon credits by VERRA.  JX 2 ¶ 6.  Such reports are commonly generated by third-party consultants experienced in performing due diligence.  JX 1 ¶¶ 11–12.

Once a developer identifies a feasible project, it undertakes a "project feasibility study."  JX 1 ¶ 12.  In Brazil, in particular, the process of obtaining VERRA verification proceeds in seven steps:  First, the project's developers obtain and review the real estate documents to make sure that there are no issues relating to the landowners' title in the land.  JX 2 ¶ 7.  Second, the project developer obtains agreements relating to a feasibility study, which is the preliminary study to confirm that, from a technical perspective, the land is suitable for a carbon project.  *Id.*

Third, the project developer and the technical team (including, *inter alia*, biologists and engineers) coordinate with all of the potential stakeholders on the project, including local landowners, businesses, and government representatives.  *Id.*  Fourth, the developer communicates with VERRA and with third-party auditors, called validation and verification bodies ("VVBs").  *Id.*; *see* Dkt. No. 35 ¶ 36.  Fifth, the project developer prepares the project design documentation ("PDD"), which includes, *inter alia*, the documents confirming land title, the technical specifications and verifications, and confirmations of meetings with stakeholders.  JX 2 ¶ 7.  Sixth, a site visit is made with the VVBs during which all of the documentation and materials in the PDD are audited and verified by the VVB.  *Id.*  And seventh, if the VVB determines that the documents and the site and all surrounding facts are consistent with VERRA standards, then the documents are submitted to VERRA.  *Id.*; *see also* JX 1 ¶ 6.  VERRA then proceeds to determine independently whether the project should be verified and, if so, registers and issues the carbon credits.  JX 2 ¶ 7; *see* Dkt. No. 35 ¶ 38.

At the time relevant to this case, 413 was in the process of developing three REDD+ Projects intended to generate carbon credits issued by VERRA.  The "Zero Carbon Aripunia River REDD+ Project" ("ZCH #1") was furthest along and was supported by a feasibility assessment dated March 19, 2021.  JX 7.  ZCH #1 involved the planned deforestation of two forested "*fazendas*" (large privately owned farmable properties) in the state of Amazonas, Brazil.  *Id.* at 3; JX 1 ¶ 11.  The project was intended to generate carbon credits by reducing emissions as against a baseline of otherwise planned deforestation and forest degradation.  JX 7.  It had received a positive feasibility report on the project.  JX 1 ¶ 11.  The "Nova Aripuana REDD+ Project" ("ZCH #2"), which ultimately was considered more valuable by Aspiration, Trial Tr. at 178, was less far along in development, *id.* at 94.  It was supported by a feasibility report dated

October 1, 2021.  JX 8; *see* JX 9.  It involved the planned deforestation of five forested

"*fazendas*" in the states of Amazonas and Matos Grosso, Brazil.  JX 1 ¶ 12; JX 4 ¶ 3.  Finally,

the 413 Environmental LLC #1 REDD Project with project ID number 2586 ("413

Environmental"), was considered by 413 to be the most valuable of its REDD+ credit projects.

Trial Tr. at 54.

## II.    The Contract Negotiations

Aspiration and 413 were introduced to one another in December 2021 by Matt Hayden,

the executive of another company that bought and sold carbon credits on the voluntary market,

who operated as an "introducer" and had previously invested with 413 in carbon credits.  JX 4

¶ 3; JX 10; Trial Tr. at 11–13; Rogers Dep. Tr. at 17:14–18:09.  When introduced, the parties

began discussing the projects that ZCH and 413 were developing and opportunities for

Aspiration to purchase carbon credits arising from those projects to be issued by VERRA.  JX 4

¶ 3; JX 10.

After initial discussions to determine whether the parties wished to do business with one

another, Trial Tr. at 12, the parties proceeded to negotiate the terms of the Confirmation

agreement, pursuant to which Aspiration would initially purchase 6.6 million carbon credits to be

generated by ZCH #2 and issued by VERRA in exchange for $29.5 million, *see* Dkt. No. 35-2.

The negotiations proceeded in two phases, over a compressed time period from January 24, 2022

to February 9, 2022.  Trial Tr. at 17.  The first phase was handled for Plaintiffs by Rogers, and

for Defendant by Lee, who at the time was either a manager or director of sustainable carbon

programs at Aspiration, and to a lesser extent, Aspiration's Chief Sustainability Officer Irfan

Kamal and its Chief Business Development Officer Tate Mill.  *Id.* at 9–10, 218–19, 222, 231–32,

234; *see* JX 1 ¶ 18; JX 12.  Lee was the principal person involved in the negotiations for

Defendant.  Trial Tr. at 123, 204, 219, 228–29.  At the time, he had been at Aspiration for five

months.  *Id.* at 219, 228.  He had responsibilities for the quality criteria processes that Aspiration was to use for evaluating carbon credits for the consumer and financial services sides of its business, and for trying to secure carbon credits for Aspiration to acquire, *id*. at 124, 204, 229, but he was not authorized to close a deal, to negotiate commercial terms, or to make binding commitments or reach definitive terms with any of Aspiration's counterparties, *id.* at 205, 218, 229–30, 233.[8]  The second phase of negotiations was handled for 413 and ZCH by Rogers, who was assisted by 413's counsel, Javier Rocha.  *Id.* at 38, 180–81; *see* JX 1 ¶ 18.  As for Aspiration, the second phase was principally handled by Aspiration's general counsel Michael Shuckerow, who was assisted by Lee, Kamal, Aspiration Chief Financial Officer Rojeh Avanesian, Greg Restituito from Aspiration's finance group, and outside counsel Jason Lawler and Ellen Petretti from the law firm Sidley Austin.  Trial Tr. at 10, 36–39, 138–39, 231.

At the time of the negotiations, the organizers of the World Cup soccer tournament, which was being held in Qatar in 2022, has solicited requests for proposals in connection with its goal of carbon neutrality.  *Id.* at 128–29.  Aspiration was in the process of submitting a bid, and, to that end, had leased office space in Qatar and established bank accounts there.  *Id.* at 128.  The firm had invested "an enormous amount of time and effort" into qualifying to make a bid.  *Id.* at 183.  Had it won the bid, Aspiration would have needed a source of supply of carbon credits, and it believed that the carbon credits generated from the ZCH project and issued by VERRA could help meet its credit obligations, which would have been due in the spring of 2023.  *Id.* at 129, 184, 209–10, 240.[9]  If it had won the bid without an agreement to prepay for credits, Aspiration would have need to source credits on the open market at whatever their cost.  *Id.* at 192.

---

[8] Tellingly each draft of the Confirmation appeared to contemplate Shuckerow as the signatory on behalf of Aspiration.  *See* JX 13; JX 14; JX 15; JX 16; JX 17; JX 22; JX 34; JX 36.
[9] Aspiration ultimately did not win the World Cup bid.  Trial Tr. at 211.

### A.    The First Phase of the Negotiations

The first phase of negotiations began in mid-January 2022 and lasted until approximately February 1, 2022, when Aspiration's investment committee rejected a proposed transaction and Shuckerow was tasked with negotiating the terms of a revised transaction.  The first phase focused, for the most part, on the quality and the pricing of the carbon credits, as well as on the date by which prepayment would be made.  Lee Dep. Tr. at 69:15–70:2.  At the time, 413 was in need of cash.  *See, e.g.*, Rogers. Dep. Tr. at 67:25–68:16 (stating that Plaintiffs "always need cash" to fund the projects).

On December 18, 2021, before the negotiations that formed the first phase began, Hayden sent an email to Aspiration, copied to Rogers of 413, presenting the opportunity for Aspiration to purchase up to $28 million of carbon credits.  Hayden wrote:

> Given that we have a short period of time to evaluate this opportunity I wanted to provide what is available and the considerations.  Currently there are $28 million worth of credits to pre-purchase (delivery by September 30, 2022) for [ZCH].  There are [two] buyers who will give us decisions by Wednesday [December 22] for up to $10 million of that.  [Aspiration] could purchase inventory to go long and sell in the future and/or you could secure corporate buyers who want to purchase for 2022/2023, etc.

JX 12.  Hayden followed up in an email dated January 3, 2022, writing:  "Currently there are $30 million worth of credits available and one other party who will finalize their participation (between $4 and $10M this week), so the remainder is what is available."  JX 12.  In response to Lee's question on behalf of Aspiration regarding pricing, Hayden indicated on January 5, 2022, that "[p]ricing is $4.50 per credit," and that "there is up to 6.67 million credits available for pre-purchase."  *Id*.  The price was attractive to Aspiration both because of its impending World Cup bid and because it was well below the market price of the credits.  Trial Tr. at 97–98, 129, 209–10, 240; Lee Dep. Tr. at 70:8–71:11, 73:5–14.  Mill, writing on behalf of Aspiration, responded that Aspiration wanted "to move forward contracting for the 6.67MM VCUs at $4.50 with

payment upon delivery." JX 12.  Thus, by January 5, 2022, 413 had offered 6,555,556 carbon

credits at a price of $4.50 per credit for a total of $29,500,000, and Aspiration had indicated its

interest in purchasing the full amount of carbon credits at the offered price.

During the initial negotiations, Lee's focus was on the technical aspects of the carbon

project development, as well as the quality of the carbon credits.  Trial Tr. at 205, 208.  He told

Plaintiffs that Aspiration wanted the carbon credits to be issued by VERRA and come with

additional CCB accreditation, signifying the project met VERRA's carbon, community and

biodiversity standards.  *Id.* at 70, 205, 216–17, 234.

The proposed purchase agreement—the Confirmation—was revised several times over

the course of the parties' negotiations.  Rogers Dep. Tr. at 23:22–25:20.  On January 24, 2022,

Lee circulated to 413 and to Hayden a first draft of a proposed purchase agreement.  *See* JX 13;

Trial Tr. at 16.  That draft agreement, which summarized the discussions of the parties to date,

Trial Tr. at 214, set forth the number and quality of the carbon credits to be provided by ZCH

and 413 and the prepayment to be made by Aspiration, *see* JX 13.  It provided that Aspiration

would make a prepayment of $29,500,000 in exchange for the delivery by ZCH and 413 to

Aspiration of 6,555,556 carbon credits generated by ZCH #2 and issued by the VERRA registry

with the additional CCB accreditation.  JX 13.  Aspiration was to make the prepayment of

$29,500,000—equivalent of $4.50 per carbon credit—by January 21, 2022.  JX 13.  ZCH and

413 were to deliver the 6,555,556 carbon credits by the "Physical Settlement Date," defined as

the "earlier to occur" of a "Termination Date" of September 30, 2024 (as could be extended by

Aspiration at its "sole discretion"), or the date specified by ZCH and 413 if ZCH #2 was

validated by the VERRA registry.  *Id.* at 2.  As security against Plaintiffs' failure to deliver, the

draft agreement required Plaintiffs to fund an escrow account with replacement credits, in the

form of carbon credits generated by the 413 Environmental project and issued by VERRA, in an amount sufficient to cover Aspiration for any shortfall as against the number of 6,555,556 credits. *Id.* at 5. Specifically, Plaintiffs were required to "deliver or cause to be delivered Replacement Credits," generated from the 413 Environmental project and issued by VERRA, into an account in the name of Aspiration, to be held in escrow by Aspiration until the Physical Settlement Date. *Id.* If, by the Termination Date, ZCH #2 had not generated sufficient carbon credits to satisfy the obligation to deliver 6,555,556 carbon credits, Aspiration would be entitled to sufficient "Replacement Credits that, when added to the number of Carbon Credits generated as of [the Termination Date], the total number of carbon credits held by [Aspiration] is equal to the Quantity." *Id.*

Three further draft agreements were prepared and sent to Plaintiffs before Aspiration's investment committee ultimately decided not to go forward with the transaction as negotiated by Lee. Each draft reflected the conversations between the negotiating teams for Plaintiffs and Defendant to date. *See* Trial Tr. at 218–19, 220–21. Each provided for the prepayment of $29.5 million for 6.6 million carbon credits issued by VERRA and to be delivered no later than September 30, 2024, but the drafts contained differences with respect to the dates of prepayment, the quality of the carbon credits, and the form of security to be given Aspiration against Plaintiffs' failure to perform. On January 26, 2022, Rogers sent employees of Aspiration a revised draft, which provided that Plaintiffs would sell Aspiration 6,555,556 carbon credits to be delivered by no later than a Termination Date of September 30, 2024 for a sum of $29,500,000 to be paid by January 26, 2022. *See* JX 15. An escrow account funded by credits from 413 Environmental or cash would provide security for Aspiration against a failure to deliver. *Id.* at 5–6. Later that same evening, Lee sent internally yet another draft that had been reviewed by

Plaintiffs.  *See* JX 14.  This draft had two prepayment dates—one that was immediate and another on February 25, 2022, on each of which Aspiration would send $14,750,000 to ZCH—but a single Physical Settlement Date defined to terminate by September 30, 2024, by which time ZCH was to have delivered to Aspiration 6,555,556 carbon credits generated by ZCH #2 and issued by VERRA.  Once again, the draft agreement provided Aspiration security against the failure by Plaintiffs to deliver.  This time, it provided that credits from 413 Environmental were to be deposited into escrow when issued and that if such credits had not yet been issued by VERRA, Plaintiffs were to fund the escrow account with cash equal to the amount of the payment made by Aspiration.  *Id.* at 5–6.

On January 28, 2022, Lee sent Hayden and Rogers (it turns out without authorization and by mistake, Trial Tr. at 131, 220), a purported executed version of the Confirmation, *see* JX 17.  It provided that Aspiration would make its $29.5 million payment split equally between two tranches, the first by January 28, 2022, and the second by February 27, 2022, in exchange for 6,555,556 carbon credits generated by ZCH #2 and issued by VERRA, with ZCH obligated to use its best efforts to obtain a CCB accreditation for the carbon credits.[10]  JX 17.  The January 28, 2022 version of the Confirmation, unlike earlier drafts, also provided that the credits would be delivered in two tranches on each of *two* Physical Settlement Dates:  3,600,000 carbon credits by "Physical Settlement Date 1," defined as the earlier to occur of (1) each date on which carbon credits were issued by VERRA between the date of execution and December 31, 2022; or (2) December 31, 2022; and 2,955,556 credits by "Physical Settlement Date 2," defined as the

---

[10] The January 26 draft contained a concession by Aspiration to Plaintiffs in that it relieved Plaintiffs of the requirement that the credits be CCB accredited, replacing that with the requirement that Plaintiffs use "best efforts" to obtain CCB accreditation.  *See* JX 14, 15.  That concession was then carried over into the January 28 draft.  *See* JX 17.

earlier to occur of the date on which credits were issued by VERRA during the period January 1, 2023 through the Termination Date of September 30, 2024, and September 30, 2024.  JX 17 at 2–3; Trial Tr. at 28.  Once again, Aspiration was given security against the failure to deliver. This time, the draft provided that Plaintiffs were to deliver to an account at the VERRA registry "all Collateral Credits upon issuance" or "if all such Collateral Credits have not yet been issued by the Registry on or before the relevant Prepayment Date, the Prepayment Amounts to be paid by Buyer (it being understood that any cash held in escrow will be substituted by the Collateral Credits once issued)" into an escrow account at Plaintiffs' law firm.  JX 17 at 6–7.

Thus, each of the drafts from January 24 to January 28 provided that ZCH would post collateral to secure ZCH's "prompt and complete performance when due" of its obligations under the Confirmation and to compensate Aspiration if, on each of the Physical Settlement Dates, there was a shortfall between the amount of Carbon Credits promised to Aspiration and the amount of Carbon Credits delivered to Aspiration.  JX 13; JX 14; JX 17.

The change to in the draft Confirmation from one Physical Settlement Date to two Physical Settlement Dates, with the earliest to be December 31, 2022, was made at the request of Aspiration.  Gagliano Dep. Tr. at 98:6–12;[11] Rogers Dep. Tr. at 28:2–24.  In an internal email of January 26, 2022, Avanesian raised the question that the agreement on its face did not "state when the credits will be delivered to the buyer," and Lee responded: "[t]he way I believe this deal is structured is that there is collateral from which we can settle with as of the Termination Date September 30, 2024, so whatever net amount of credits below the 6.5mm we're contracting for that they haven't delivered by that point, we can settle with either replacement credits or

---

[11] Gagliano is an employee specializing in operations at 413.  Gagliano Dep. Tr. at 31:04–31:18. He has overseen efforts to bring some of ZCH's carbon credits projects, including ZCH #1, to issuance.  *Id.* at 38:19–39:08.

cash." JX 16.  In reply, Avanesian asked "what about a commitment for 2021 delivery?  Is it

possible to include a minimum guarantee for 2021.  That way [Aspiration] will have more

certainty around 2021 tonnage for the world cup." *Id.*  Lee replied with the suggestion that

Aspiration include a commitment of 3.6 million credits by December 31, 2022, corresponding to

what the project's feasibility assessment suggested was a reasonable estimate.  *Id.*  The

suggestion found its way into the January 28, 2022 draft.  The date related to the specific

timeline that Aspiration needed to meet for the World Cup obligations it was bidding on.  Trial

Tr. at 171.

On February 1, 2022, Lee and Kamal presented the proposed transaction to Aspiration's

investment committee, Trial Tr. at 222–23, which rejected the proposal, JX 18.

### B.    The Second Phase of the Negotiations

The second phase of negotiations, which was characterized by numerous emails,

conference calls, and revised drafts of the proposed transaction, occurred approximately between

February 1 and February 9, 2022.  *See* Trial Tr. at 18; JX 22–35.  By that time, Plaintiffs had

made commitments to other internal projects for which it needed at least some of the $29 million

which Plaintiffs believed they would receive from Defendant based on the January 28 draft

agreement.  Trial Tr. at 33.

The parties focused on the security to be provided to Aspiration in the event that ZCH

was unable to meet its delivery obligations.  In particular, following the February 1 investment

committee meeting, Lee wrote to Rogers, copying Shuckerow and Avanesian among others,

stating that Shuckerow and Avanesian had some questions that he had been unable to answer and

requesting a conference call.  JX 18; Trial Tr. at 29.  Shuckerow's concerns were that Aspiration

had not been able to conduct the type of diligence it would ordinarily have done on a project of

the size that was being proposed and that, as a result, it needed more security to ensure that the

project was able to deliver the credits for which Aspiration was bargaining.  Trial Tr. at 181–82, 190–91.[12]  During the course of the negotiations forming the second phase, Shuckerow explained to Plaintiffs the need for the carbon credits for the impending World Cup bid.  Trial Tr. at 184–85.

The first conference call with Shuckerow took place on the morning of February 2, 2022, and included Rogers on behalf of 413 and Avanesian on behalf of Aspiration.  Trial Tr. at 29, 34.  During the call, Shuckerow advised that in order for Aspiration to move forward with the proposed deal it would need significantly more protections in the form of collateral than what he viewed as existing in the draft agreement.  *Id.* at 29.  Shuckerow sought, in lieu of the provisions in the prior draft, a provision that contemplated the money thatAspiration was paying for the credits be put and held in escrow to be released only for project activities related to ZCH #2 and only when the credits were delivered.  *Id.* at 31, 145–46.  413 resisted the request, expressing that it needed the ability to use the money for whatever purposes it wanted as long as it continued to develop the projects, but Aspiration indicated that an escrow was very important to it.  *Id*. at 32, 141–42; *see* JX 19.

Following the conference call, Rogers wrote to Joe Sanberg, the founder of Aspiration, Trial Tr. at 10, and Lee, to complain about the requests made by Shuckerow and Avanesian, JX 19.  Rogers highlighted that Plaintiffs were offering Defendant a very good price for the carbon credits and that 413 was prepared to share its service provider contracts with Defendant as part of due diligence, but that Plaintiffs were not willing to restrict the use of the funds in escrow.  *Id.*;

---

[12] Shuckerow testified that Aspiration typically would have sent a team to inspect the projects, conducted background checks with a private investigator, received satellite imagery, and had drone inspection rights and had greater visibility into its counterparty.  Trial Tr. at 182, 190.  Aspiration did not conduct that diligence because of the timeline that both it and Plaintiffs were under.  *Id.* at 191.  It was not denied any due diligence that it requested.  *Id.* at 123, 212.

*see* Trial Tr. at 31–33.  Rogers wrote: "[t]he use of proceeds on our side will be for ongoing project development of these projects but also some diversification of our interests internally" and that 413 was "not looking for any stipulations of how [it] spen[t] [its] money internally," adding that time was "of the essence" because it had made "some commitments" based on the January 28 draft agreement.  JX 19.[13]  Referencing the prior draft agreement, Rogers assured Defendant that it was protected against delays in issuance of the carbon credits by the previously contemplated escrow account, writing that the account was "cross collateralized by another project, has us committing to depositing cash in escrow upon issuance to offset *any future issuance delay* and locks in very favorable pricing for you."  *Id.* (emphasis added); *see* JX 4 ¶ 8.[14]

The conference call and Rogers's email to Sanberg and Lee initiated discussions that ultimately resulted in a change in the form of collateral Aspiration requested and would receive as security against the risk of delay in the issuance of credits.  Instead of "replacement" or "collateral" carbon credits being held as security for Aspiration against any shortfall, with cash being placed in escrow only until such credits were generated, Aspiration focused on overcollateralizing the transaction and the receipt of a pledged security interest in the entity controlling ZCH #1 and ZCH #2 in order to be able to manage the projects if there was a failure to deliver on a timely basis.  Trial Tr. at 143, 148–49.  Sanberg responded to Rogers with assurances that Aspiration wanted to execute the transaction, that it was requesting "a light

---

[13] As Rogers testified, it was his view that it was none of Defendant's business how Plaintiffs spent the money that Defendant was paying in advance for the credits.  Trial Tr. at 32.

[14] Rogers also wrote that if Aspiration wanted a transaction that had "zero risk," it could "wait until issuance and pay current market price."  JX 19.  In context, it is apparent that the risk to which Rogers was referring was the risk that the collateral would be insufficient to protect Aspiration in the event of a delay, and not that Defendant would risk delay in the first instance.

version of standard [due diligence] on a deal of this size" and could likely "give on the Escrow trust . . . if Aspiration gets the contingency controlling interest in their [three] projects if they fail to deliver, which should be an easy contractual language add."  JX 19; *see* JX 4 ¶ 9.  Rocha responded on behalf of 413 that Aspiration's willingness to "give" on the escrow provision went "a long way" for 413, but asked what was meant by a "contingency controlling interest" and to which three projects Aspiration was referring.  JX 19.

The parties scheduled a call which occurred on February 4, 2022, to discuss what Aspiration needed in terms of contingent controlling interests "to get the deal finalized."  JX 20; Trial Tr. at 40.  Following up on that call, on Saturday, February 5, 2022, Lawler circulated to the group a revised draft forward confirmation and "the equity pledge agreement that [the parties] previewed on the call yesterday," subject to Aspiration's further internal review and due diligence, including with respect to any pre-existing commitments that ZCH had made with respect to the carbon credits to be generated from the projects.  JX 22; JX 23.  Several changes were made to the Confirmation.  The prepayment amounts were moved forward such that Aspiration agreed to pay $20 million on the effective date of the agreement and $9,500,000 approximately one week later.  JX 22.  Aspiration added language to the draft agreement stating that "[f]or the avoidance of doubt, Seller shall cause the Total Quantity to be delivered to Buyer during the Term hereof."  *Id.*; *see* Trial Tr. at 42.  The draft contained an escrow provision, requiring ZCH to maintain an escrow account funded by all carbon credits generated by 413 Environmental in a quantity equal to at a minimum the amounts of 3,600,000 and 2,955,556 carbon credits to be delivered on each of the two Physical Settlement Dates, cash sufficient to cover Aspiration for the-then cost of carbon credits of the same vintage.  JX 22.  It also added a new provision regarding collateral.  ZCH granted to Aspiration "a security interest in all of its

respective rights with respect to any reforestation program or other nature-based solution resulting in greenhouse gas reduction," including its management rights with respect to ZCH #1 and ZCH #2 as "collateral security for the prompt and complete performance when due" of ZCH's obligations under the Confirmation.  *Id.*  The Equity Pledge Agreement gave Aspiration a security interest in one or more projects but also a security interest in 413's membership interest in ZCH, the project proponent.  Dkt. No. 35-3; Trial Tr. at 41.  Thus, as Rogers understood it, the Equity Pledge Agreement was intended to address the ask by Aspiration that it have a contingency controlling interest in the projects if ZCH failed to deliver.  Trial Tr. at 40–41.  As Shuckerow testified at trial, and as he explained to Plaintiffs at the time, in the event that ZCH was not able to deliver the credits on a timely basis, Aspiration would need to have the ability to step in and take control of the project to ensure that it was able to get the credits it needed.  *Id.* at 192.

Rocha, on behalf of 413 and ZCH, responded on Sunday February 6, 2022, stating that "[t]he proposed draft [went] beyond the original deal."  JX 23.  Rocha's objection was targeted specifically at the language regarding "any reforestation program or other nature-based solution resulting in greenhouse gas reduction," which he claimed had gone beyond the parties' discussions and agreements which related only to ZCH #2 and the 413 Environmental project. *Id.*  He stated:

> Our intent of the deal was to sell 6,555,556 of future carbon credits in Zero Carbon Holdings #2 at a discounted price of $29,500,000 ($4.50/credit).  As collateral, we were pledging the value of $29,500,000 in 1) 413 Environmental [] carbon credits, 2) cash, OR 3) 413 Environmental [] carbon credits + cash.  The $29,500,000 was to be deposited with no cash restrictions.

*Id.*  Rocha lodged no other objections.

Shuckerow responded later that day recounting what he understood to be the history and current status of the negotiations.  He explained that the "execution ready version" was provided

on January 28 based on an "an internal miscommunication" and that he had "express[ed] two calls ago" that the deal was "DOA" [dead on arrival] if the $29 million that Aspiration had agreed to pay ZCH for the credits was "immediately accessible" and that, in the scenario where the $29 million was immediately accessible, Aspiration "would need significant rights to step in and run the project and have rights to enough credits to cover [its] costs in doing so," which he estimated to be four times the $29 million.  JX 24.  He concluded that "all ZCH has to do is deliver on the contract if they don't want these contingencies to kick in."  *Id.*

Lawler sent a follow up email shortly thereafter explaining both the escrow and the collateral.  The escrow was intended to cover Aspiration's costs if ZCH "fail[ed] to deliver the required ZCH [#]2 credits."  JX 24.  The purpose of the requested collateral, which consisted of "ZCH and 413's rights in the three projects . . . as well as the [413's] membership interests in ZCH and 413" was "to provide Aspiration with the ability to satisfy the obligations owed to it by providing a controlling right in the projects if the project vehicles [did] not produce sufficient credits and the escrow is otherwise under-capitalized to satisfy Aspiration's damages from the failure to deliver credits on the settlement date(s)."  JX 24.  As Rogers testified at trial, he understood the settlement dates referenced by Lawler to refer to the physical settlement dates in the Confirmation.  Trial Tr. at 52.

The parties had another conference call on Monday, February 7.  *Id.* at 53.  Following that call, Rocha wrote with another set of proposals that included Aspiration's immediate funding of the full $29,500,000 on the date of execution, escrow, and a "controlling interest in the ZCH #2 project development" if ZCH did not hit a number of benchmarks regarding that project.  JX 28.[15]  Lawler responded that he was still discussing the proposal with Aspiration but

---

[15] Rocha's email stated, however, that if Plaintiffs defaulted on their obligation and Aspiration

requested documentation regarding any other claims to credits to be generated by collateral projects, which would "be helpful in fashioning the appropriate language for the circumstances where Aspiration looks to recoup damages by exerting control over a non-producing project." *Id*. There followed further colloquy with respect to third-party claims, with Rocha representing that any other claims would have "second priority after Aspiration," and Lawler reiterating "our ask on collateral is for Aspiration to have the right—only in the unlikely event that the projects are not performing—to step into the project vehicle shoes to operate the projects in order to recoup its damages from a failure to deliver." JX 30.

The parties had a call on the evening of February 7, 2022. Trial Tr. at 59; *see* JX 28. After the call, Lawler circulated an email that contained a bullet-pointed summary of what had been discussed. JX 31; *see* Trial Tr. at 60, 68–69; Rogers Dep. Tr. at 72:18–73:09. The email is telling. Based on the call, Lawler summarized the deal terms as follows:

- Payment: $29,500,000 on Day 1

- Delivery obligations:

  o At least 3.6MM ZCH #2 credits by December 31, 2022 (as may be extended until March 31, 2023 at the latest by mutual agreement of the parties not to be unreasonably withheld)

  o Remaining 2,955,556 ZCH #2 credits by September 30, 2024 at the latest (as may be extended by Aspiration in its sole discretion)

- Escrow: no escrow

- Collateral

  o Project rights and carbon credits of ZCH #1 and ZCH #2

  o [ZCH] membership interests issued to [413]

---

received the controlling interest in ZCH #2, the controlling interest would be transferred back to Plaintiffs after the contracted-for carbon credits were transferred to Aspiration. JX 28.

- New project vehicles
  - To discuss

JX 31.

The revised deal terms reflected several concessions by Aspiration.  For its part, Defendant agreed to pay the entire $29.5 million on the day the transaction was executed.  Trial Tr. at 60–61.  Defendant also agreed that there need be no escrow.  *Id.* at 61.  The collateral represented a concession by Plaintiffs—Plaintiffs pledged to give Defendant rights to and carbon credits of ZCH #2, as well as rights to and credits of ZCH #1, and 413's membership interest in ZCH.  *Id.* at 62.

The following morning, February 8, 2022, Rocha responded to Lawler's email to ask for a draft of the agreement.  JX 34.  Lawler responded with two successive emails.  The first stated that Aspiration needed more time to finish due diligence and to finalize "a few details in the language."  *Id.*  The second stated that Aspiration had reviewed the ZCH #1 feasibility study while on the call the prior night and expressed "concern[] about the ability of ZCH [#]1 to produce enough credits to satisfy the [end of year] delivery obligations Aspiration needs."  *Id.*  Lawler's email confirmed that Aspiration was "still focused on making th[e] deal happen [that day or the next] and [was] circling up for internal approvals," but in the interim, requested that 413 "provide some comfort that ZCH [#]1 and ZCH [#]2 would produce enough credits to satisfy the 3.6mm EOY delivery obligation."  *Id.*  Understanding that "EOY" referred to "end of year," Trial Tr. at 65, Rogers replied two hours later with a lengthy email that contained the "comfort" Aspiration sought that ZCH would be able to deliver 3,600,000 carbon credits by the end of 2022, JX 34.  The email included estimated timelines for feasibility, PDD, verification, and VERRA registration for the ZCH #1 and ZCH #2 projects, and set forth mid-range estimates that ZCH #1 would generate 1,560,905 credits by year end 2022 for the 2021 vintage and the

same quantity for 2022 vintage by February 28, 2023, and that ZCH #2 would generate

4,233,107 credits by year end 2022 "'IF' [413] successfully validate[d] th[e] project by year end"

and the same quantity for the 2021 vintage by February 28, 2023.  *Id*.  Rogers concluded:

> The entire premise of our deal was to presell "preregistered" credits to your side
> from the ZCH #2 project.  Now, we are agreeing to give you 100% of the credits
> issued in the ZCH #1 project, in lieu of an escrow, which is much further along the
> process.  We agree this is the cleanest approach.  However, the end volumes
> received from ZCH #1 have to be passed through to your side, and if short of the
> requested 3.6M tons, the difference will be adjusted to ZCH #1 2022 vintage and
> or ZCH #2 2021 vintage when issued.

*Id*.  Rogers stated that the "focus for both our sides is the issuance of the projects at hand." *Id*.[16]

Based on that response, Aspiration sent a revised draft confirmation at approximately

1:00 P.M. on February 8, reflecting the terms the parties had discussed over the prior eighteen

hours, including on the call on the prior evening, February 7.  *Id.*; *see* Trial Tr. at 68–69; Rogers

Dep. Tr. at 72:18–73:09.  The draft contained the two Physical Settlement Dates, upon which

3,600,000 and 2,955,556 carbon credits, respectively, would be transferred to Aspiration,

collateral in the form of a security interest in Plaintiffs' reforestation programs or other nature-

based solutions resulting in greenhouse gas reduction as security for ZCH's "prompt and

complete performance when due," and eliminated the escrow provision.  JX 34.

The parties had one last call on the evening of February 8.  *See id*.  As a result of that call

and after talking with Aspiration, Lawler proposed a series of revisions to the draft confirmation.

*Id*.  Aspiration agreed to remove the condition that the carbon credits receive CCB accreditation.

*Id.*; Trial Tr. at 70.  Aspiration also agreed to a "1.3x credit buffer" for the collateral in the event

of a default and stated that it would be giving a pre-authorization release of its security interest

---

[16] Rogers went on to state that "[o]nce the projects are issued, delivery of credits will be a simple
task," JX 34, consistent with the notion that delivery of the credits after issuance was a worry of
Aspiration's, Trial Tr. at 177, but not the primary risk with which it was concerned, *id.* at 195.
As Shuckerow testified, it was a "much, much lesser secondary risk."  *Id*.

held in escrow.  JX 34.  As Aspiration explained it, Aspiration needed to be overcollateralized to cover the cost of having to take over the projects if Plaintiffs failed.  Trial Tr. at 192–93.

Finally, Lawler's note reflected Aspiration's refusal to agree that carbon credits due during the first Physical Settlement Period be rolled over into the second Physical Settlement Period.  His email to Rogers and Rocha in that respect reads as follows:

> **Rollover**.  While we cannot agree to the right to roll over undelivered credits into the next settlement period for the reasons we discussed, Aspiration is not looking to unreasonably trip a default.  We have added an extension option for the first settlement date (not to exceed 90 days, for Aspiration's internal business needs).  This should provide more than enough time for project to produce under the timelines Jay provided.

JX 34; *see also* Trial Tr. at 176.  The reference to the "timelines Jay provided" was to the email Rogers sent earlier that day laying out the timelines for the issuance of carbon credits.  Trial Tr. at 200.  As Shuckerow explained it at trial and at the time to Plaintiffs, Aspiration did not want to give Plaintiffs a rollover because it needed the credits for its World Cup bid, but it also did not want Plaintiffs to "footfault" if Aspiration was still able to meet its deadline for the World Cup bid.  *Id*. at 174, 176, 186.

Rocha responded that same evening of Tuesday February 8, with a single revision on the language regarding the release of liens, making clear that the license would be released upon the successful transfer of the total quantity of carbon credits.  JX 35; *see* Trial Tr. at 73, 188–89.  On February 9, the Confirmation and Equity Pledge Agreement were executed and Aspiration paid ZCH $29.5 million.  JX 35; Trial Tr. at 74.

On May 29, 2022, Hayden—who had been kept apprised by Rogers of the development of the parties' transaction, *see, e.g.*, JX 33—sent Rogers an email, expressing his understanding of the obligations of 413 and ZCH to Aspiration, *see* JX 40.  The email stated in part: "Due to Aspiration + 6.56M credits (split on delivery between 2022/2023)."  *Id*.  In outlining the credits

that could expected to be generated from the projects over the next four years, Hayden also stated that for 2023, 413 and ZCH owed "3.6M to ASP." *Id.* In his response, Rogers did not dispute those figures. *Id.*

Before the Confirmation was signed, on February 4, 2022, ZCH contracted with Radicle, a third-party consulting group, to complete the underlying development work required for the ZCH #2. *See* JX 8.

### III.   The Final Agreements

On February 9, 2022, the parties signed the International Swaps and Derivatives Association ("ISDA") Master Agreement, Dkt. No. 35-1, and February 9, 2022 Confirmation for the prepaid forward transaction, Dkt. No. 35-2, and the Equity Pledge Agreement, Dkt. No. 35-3, securing ZCH's performance, JX 35.

Pursuant to the Confirmation, ZCH agreed to deliver 6,555,556 carbon credits in the Physical Settlement Quantities on two separate dates, the "Physical Settlement Dates." *See* Dkt. No. 35-2. The Confirmation provided in relevant part:

> On or before each Physical Settlement Date, Seller [ZCH] shall deliver or cause to be delivered to the Buyer [Aspiration], Carbon Credits in the relevant Physical Settlement Quantity for such Physical Settlement Date. It being understood that there may be multiple Physical Settlement Dates during each Physical Settlement Calculation Period until the Period 1 Amount or the Period 2 Amount, as applicable, is reached. For the avoidance of doubt, Seller [ZCH] shall cause the Total Quantity to be delivered to Buyer [Aspiration] during the Term hereof. The delivery of any such Carbon Credits shall be in accordance with the then current market practice for delivery of carbon credits issued by the Registry on or about the relevant Physical Settlement Date. *Notwithstanding the foregoing, it is the intent of the parties that Buyer [Aspiration] shall acquire all right, title and interest in and to the relevant Carbon Credits immediately upon issuance thereof by the Registry.*

*Id.* at 2 (emphasis added). The credits could be generated by either or both of the two "Approved Projects"—ZCH #1 or ZCH #2. "Carbon Credits" are defined in the Confirmation as "the

carbon credits issued by the Registry and generated by either of the Approved Projects," and

"Approved Projects" is defined as either ZCH #1 or ZCH #2.  *Id.* at 3.

The "Physical Settlement 1 Date" obligated Plaintiffs to transfer 3,600,000 carbon

credits.  Consistent with the parties' discussions, the Confirmation provides a deadline of end of

year 2022 for the delivery of the first tranche of carbon credits with the possibility of an

extension to the end of March 2023.  *Id.* at 2.  The Confirmation defines "Physical Settlement 1

Dates" as:

> [T]he earlier to occur of: (x) each date on which Carbon Credits are issued by the
> Registry (each a 'Registry Issuance Date') during the Physical Settlement 1
> Calculation Period; and (y) December 31, 2022 (as may be extended by up to ninety
> (90) days by mutual agreement of the parties, not to be unreasonably withheld).

*Id.*  The Confirmation defines "Physical Settlement 1 Quantity" as:

> The amount of Carbon Credits issued by the Registry on each Registry Issuance
> Date during the Physical Settlement 1 Calculation Period; *provided, however*, in no
> event shall the aggregate Physical Settlement 1 Quantity for all Physical Settlement
> 1 Dates during the Physical Settlement 1 Calculation Period exceed 3,600,000
> Carbon Credits (the "Period 1 Amount").

*Id.* (emphasis in original).  The Physical Settlement 1 Calculation Period is "[t]he period from

and including, the Effective Date [February 9, 2022] through, and including, December 31, 2022

(as extended)."  *Id.*

Also consistent with the parties' discussions, the Confirmation provides for the delivery

of a second tranche of carbon credits by September 30, 2024.  *Id.* at 3.  The Physical Settlement

2 Quantity covers the remaining 2,955,556 credits, and is defined as "the amount of Carbon

Credits issued by the Registry on each Registry Issuance Date during the Physical Settlement 2

Calculation Period," a period which runs through the Termination Date of September 30, 2024.

*Id.*  The Termination Date is September 30, 2024 (as may be extended by Aspiration in its sole

discretion).  *Id.* at 1.  In sum, the Confirmation contemplates the sale of 6,555,556 credits—

3,600,000 of which were to be transferred by the first settlement date and 2,955,556 of which were to be transferred by the second settlement date.

The Confirmation also contains the security that the parties negotiated in the form of a "Collateral" provision.  *Id.* at 5–6.  As collateral for its performance of the obligations under the Agreement, ZCH granted Aspiration a security interest in all of its rights with respect to each of the Approved Projects, in each case, including without limitation all rights to control and operate project activities in accordance with ZCH's status as "Project Developer" and its entitlement to up to 8,522,223 carbon credits generated by the projects.  *See id.*  The 8,522,223 carbon credits is equivalent to 1.3 times the quantity of carbon credits contracted for, which Aspiration had represented it would need if it was to assume the control and operation of the Approved Projects to compensate for any damage from Plaintiffs' failure to deliver and the additional costs of having to run the Projects.  Trial Tr. at 72, 149.

The Confirmation compels the parties to "use good faith efforts to diligently develop and operate the Approved Projects" and to "take all actions reasonably required to cause the Registry to issue the Carbon Credits as soon as possible."  Dkt. No. 35-2 at 7.

Also consistent with the parties' discussions, and to facilitate this arrangement, 413—the sole member of ZCH—pledged its membership interests in ZCH to Aspiration pursuant to an Equity Pledge Agreement that, like the Confirmation, was dated February 9, 2022.  *Id.* at 1; Dkt. No. 35-3.  Pursuant to the Equity Pledge Agreement, 413 pledged to Aspiration all its right, title and interest in ZCH as security for "the due and punctual performance and payment in full of all of ZCH's obligations under the Prepaid Forward Agreement."  Dkt. No. 35-3 ¶ 2(a); *see* Dkt. No. 35 ¶ 79.  In an "Event of Default" on the Confirmation, Aspiration had the right to exercise the

voting rights and powers of ZCH, and to be substituted for 413 by acquiring 413's rights with respect to ZCH under the LLC Agreement.  Dkt. No. 35-3 ¶ 7.

"Events of Default" are defined in Section 5 of the ISDA Agreement.  Dkt. No. 35-1 ¶ 5. Section 5(a)(i) of the ISDA Agreement provide, in relevant part:

> (a) **Events of Default**.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:
>
> > (i) **Failure to Pay or Deliver**.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the First Local Delivery Day in the case of any such delivery after, in each case, notices of such failure is given to the party.

*Id.* ¶ 5(a)(i).  Upon the Event of Default, Aspiration would be entitled to the proceeds otherwise due ZCH in an amount sufficient to satisfy ZCH's obligations under the Confirmation.

Aspiration paid the $29.5 million on February 9, the day that the agreements were executed.  Gagliano Dep. Tr. at 78:18–25.

## IV.    Delays in the Projects

Aspiration received very little in the way of updates with respect to either ZCH #1 or ZCH #2 until the beginning of December 2022 when the parties began to have bi-weekly conference calls to discuss the status and delays in the issuance of credits.  It was not until one of these calls that 413 informed Aspiration that ZCH had fired EcoSecurities and hired BMO Radicle to redraft the PDDs which would be needed in connection with the audit and verification process for the carbon credit projects.  *See, e.g.*, Gagliano Dep. Tr. at 44:19–50:20.

In or around April or May 2022, ZCH retained a Brazilian firm called Ecofix Natural Capital to complete forest inventory and soil sampling on the parcels of land comprising ZCH

#2.  JX 1 ¶ 55.  In or around October 2022, when the development process for ZCH #2 was approximately sixty percent complete, Ecofix notified ZCH that all seven of the land parcels comprising ZCH #2 were overlapped by public park areas designated by state governments.  *Id.* ¶ 56.  Following this news, management of 413 and ZCH arranged a trip to Brazil to meet with servicer providers, Brazilian counsel, government officials, and MediaGeo to move forward with the project.  After one of the meetings with stakeholders, and before a meeting with the VVB could be arranged, representatives of the project developers were threatened by persons they understood to be illegal loggers who threatened to kill them.  Trial Tr. at 116.  As a result, ZCH #2 has never gotten beyond the step of coordinating with potential stakeholders and to the step of communicating with VERRA.  *Id.* at 109.  As of December 2022, ZCH #2 had proceeded as far only as finalizing the PDD and had not gotten to the step of arranging a site visit with the validation and verification body.  *Id.*  Currently, ZCH #2 "is dead in the water with no hopes of reviving."  Gagliano Dep. Tr. at 41:05–12.

On January 24, 2023, however, ZCH received a letter that concluded:  "As of the date of this letter, the conclusion for this Project is that, because of the public park overlaps, unfortunately development of a VCS carbon credit project on the Parcels would be very time consuming and would depend on full cooperation from the Government."  JX 48.  The next day, Plaintiffs forwarded the letter to Aspiration and proposed two compensatory options it was prepared to offer.  *See id.*  The first option would have had Plaintiffs transfer credits to Aspiration generated from the ZCH #2 and 413 Environmental projects "within five business days of their registration and issuance by VERRA."  *Id.*  Plaintiffs estimated that the number of carbon credits contracted for—6,555,556 in total—would be generated from the two projects before June 30, 2023.  *Id.*  Under the second option, Plaintiffs would "transfer to Aspiration all

rights to [ZCH #2] upon registration and issuance of th[e] project," expected to generate 13,705,917 carbon credits, with a note that the parties would "need to work out a discounted price for the overage expected of 5,183,694 credits." *Id.*

ZCH #1, the smaller of the two Approved Projects, did not fare much better. Although Plaintiffs expected the carbon credits associated with ZCH #1 to be issued in or around late in the third quarter of 2022, several key political and other events significantly delayed their issuance. JX 1 ¶ 59. In or around October 2022, Brazil held a contentious presidential election that was preceded and followed, in the period from June to December 2022, by significant social and political unrest that, Plaintiffs claim, prevented the issuers access to the land to timely complete their audit work. *Id.* ¶¶ 59–60; JX 52 at 12–13. When it became clear that the political unrest would delay issuance of ZCH #1, the parties agreed to extend the Physical Settlement 1 Date from December 31, 2022 to March 31, 2023. JX 1 ¶ 61; JX 52 at 12–13; Rogers Dep. Tr. at 32:7–9. However, in or around January 2023, the issuer's audit was again delayed, this time by low water levels in the rivers that prevented access to the ZCH #1 site. JX 1 ¶ 62; JX 52 at 13. ZCH notified Aspiration of these delays. JX 1 ¶ 63.

To date, VERRA has not issued credits with respect to either ZCH #1 or ZCH #2, Trial Tr. at 109; Dkt. No. 35 ¶ 42, and Plaintiffs have not issued any carbon credits to Defendant, Gagliano Dep. Tr. at 88:10-13. ZCH #2 has been terminated as a project and will not produce carbon credits. *Id.* at 41:5–12.

## V.      Aspiration's Notice of Default

On February 1, 2023, Aspiration sent the first of what would become three notices of default to ZCH under the ISDA Agreement. *See* Dkt. No. 35 ¶ 73. The notice stated that ZCH had defaulted under Section 5(a)(iv) of the ISDA Agreement by certain oral representations that ZCH had made regarding the Approved Projects and asserted its right to foreclose its security

interests in accordance with the Equity Pledge Agreement.  *Id.*; *see* Dkt. No. 35-4.  Aspiration

sent a second notice of default to ZCH on March 28, 2023.  Dkt. No. 35 ¶ 75; *see* Dkt. No. 35-5.

Again invoking Section 5(a)(iv) of the ISDA Agreement, Aspiration asserted the same alleged

misrepresentation and once again invoked its right to immediately seek to foreclose its security

interests under the Equity Pledge Agreement.  Dkt. No. 35-5.  On May 17, 2023, Aspiration sent

a third notice of default to ZCH.  Dkt. No. 35 ¶ 77.  The third notice asserted that ZCH had failed

to timely deliver the carbon credits pursuant to Section 5(a)(i) of the ISDA Agreement.  *Id.*

On May 8, 2023, Aspiration delivered notice to ZCH and 413 of its intent to sell (1) the

membership interests issued by ZCH; and (2) the rights to each of the Approved Projects pledged

by ZCH.  *Id.* ¶ 81; Dkt. No. 35-6.  Two weeks later, Aspiration sent a second notice of its intent

to sell the interests, setting the date of public auction as June 26, 2023.  Dkt. No. 35 ¶ 82; Dkt.

No. 35-7.  Aspiration pushed off the public auction several times.  *See* Dkt. Nos. 35-8, 35-9, 35-

10.  Plaintiffs then initiated this suit.

## CONCLUSIONS OF LAW

### I.  Defendant's Claim for Breach of Contract and Declaratory Judgment and Plaintiffs' Claim for Declaratory Judgment Regarding Failure of a Condition Precedent

Aspiration argues that Plaintiffs breached the Confirmation by failing to deliver the

required carbon credits to Aspiration by March 31, 2023 and that an "Event of Default" has

occurred, entitling Aspiration to remedies under the Equity Pledge Agreement.  For their part,

Plaintiffs argue that the Confirmation required them to deliver only those carbon credits that

were *issued* by VERRA by March 31, 2023.  Because VERRA had not issued any carbon credits

by March 31, 2023, Plaintiffs argue that they are not in breach.

Under New York law,[17] the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. *Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 318 (S.D.N.Y. 2020). There is no dispute here that Plaintiffs and Defendant are parties to valid agreements or that Defendant has performed under the Confirmation by paying $29.5 million to ZCH. The parties disagree as to whether Plaintiffs have breached their obligations under the Confirmation and the Equity Pledge Agreement and the proper interpretation of those documents.

"In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). "[A]greements are construed in accord with the parties' intent," *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004), and "the best evidence of intent is the contract itself," *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010) (quoting *Hatalmud v. Spellings*, 505 F.3d 139, 146 (2d Cir. 2007)).

"At the outset, the court must determine whether the language the parties have chosen is ambiguous, after giving all words and phrases . . . their plain meaning." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (internal citation and quotation marks omitted). The court looks to the totality of the agreements and attempts to "give effect and meaning . . . to every term of [the] contract and strive to harmonize all of its terms." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (internal citation and quotation marks

---

[17] New York law applies to the Confirmation and the Equity Pledge Agreement. *See* Dkt. No. 35-4 ¶ 18.

omitted); *see also* Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation

which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is

preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").  The

court "should 'examine the entire contract and consider the relation of the parties and the

circumstances under which it was executed.  Particular words should be considered, not as if

isolated from the context, but in the light of the obligation as a whole and the intention of the

parties as manifested thereby.'"  *Holland Loader Co. v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469

(S.D.N.Y. 2018), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order) (quoting *MBIA Ins.*

*Corp. v. Patriarch Partners VII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012)); *see also JA*

*Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).  A contract is clear and

unambiguous "where the contract language has a definite and precise meaning, unattended by

danger of misconception in the purport of the [contract] itself, and concerning which there is no

reasonable basis for a difference of opinion."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon*

*Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (quoting *L. Debenture Tr. Co. of N.Y. v.*

*Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)); *see also John Hancock Mut. Life Ins.*

*Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 461 (2d Cir. 1994) (explaining that contract language

is unambiguous only if it is "unattended by danger of misconception in the purport of the

contract itself").  "Construction of an unambiguous contract is a matter of law, and the intention

of the parties may be gathered from the four corners of the instrument and should be enforced

according to its terms."  *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007).  On the

other hand, "[a] contract is ambiguous under New York law 'if its terms could suggest more than

one meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology as generally understood in the particular trade or business.'"  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114).  Where "there are a number of reasonable interpretations of the relevant [c]ontract provisions," the contract is "ambiguous as a matter of law."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 297 (2d Cir. 2015).  "[E]xtrinsic evidence may not be considered unless the document itself is ambiguous."  *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) (quoting *S. Rd. Assocs., LLC v. Int'l Bus. Mach. Corp.*, 826 N.E.2d 806, 810 (N.Y. 2005)).

Each of Plaintiffs and Defendant offer forceful arguments for their contract interpretation. Focusing on the Confirmation alone, and on the definitions of "Carbon Credits" and "Physical Settlement Quantity," Plaintiffs argue that the issuance of carbon credits by VERRA was a condition precedent[18] to its obligation to deliver carbon credits by any particular deadline, and that in the absence of carbon credits being issued by VERRA, it had no obligations to Aspiration with respect to the carbon credits.  Plaintiffs rely, Dkt. No. 63 at 4–5, on a simple syllogism: (1) the Confirmation requires ZCH, "[o]n or before each Physical Settlement Date," to "deliver or cause to be delivered" to Aspiration, "Carbon Credits in the relevant Physical Settlement Quantity for such Physical Settlement Date"; (2) "Carbon Credits" is a contractually-defined term that "[m]eans the carbon credits issued by the Registry and generated by either of the Approved Projects"; (3) the "Physical Settlement 1 Quantity" is "[t]he amount of Carbon Credits issued by the Registry of each Registry Issuance Date during the Physical Settlement 1

---

[18] "[A] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 753 (S.D.N.Y. 2021) (quoting *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016)).

Calculation Period"; (4) the Registry did not issue any carbon credits during the Physical Settlement 1 Calculation Period; and (5) therefore, ZCH had no obligation to deliver or cause to be delivered any carbon credits.  Plaintiffs also rely on the fact that the definition of "Physical Settlement 1 Quantity" is qualified by the provision that "in no event shall the aggregate Physical Settlement 1 Quantity for all Physical Settlement 1 Dates during the Physical Settlement 1 Calculation Period exceed 3,600,000 Carbon Credits" and that the Confirmation requires ZCH to "use good faith efforts to diligently develop and operate the Approved Projects."  *See* Dkt. No. 35-2 at 7.  Plaintiffs reason that the proviso establishes that there was only a maximum—not any minimum—number of credits that ZCH was to deliver by the Physical Settlement Date, and that ZCH's only obligation was to operate in good faith and to deliver the credits if issued.

Plaintiffs do not dispute that Aspiration could hold ZCH to the obligation to deliver 6.6 million carbon credits from the Approved Projects at some point.  *See* Dkt. No. 63.  Plaintiffs reconcile that position with the fact that their interpretation of the Physical Settlement Quantity would have the obligation to deliver carbon credits be extinguished by the Termination Date at the latest by pointing to the fact that the Termination Date could be extended at the option of Aspiration.[19]  Plaintiffs argue that, if ZCH failed to deliver any Carbon Credits by the Termination Date, Defendant's remedy was not to declare an "Event of Default" but to continue to extend the Termination Date indefinitely until ZCH delivered the Carbon Credits.  If the

---

[19] Plaintiffs argue that the Court should not consider the fact that the transaction was structured as a prepaid forward contract and not an option because "it was Aspiration that unilaterally chose to use the 'prepaid forward' transaction format, and there were no discussions or negotiations about that format."  Dkt. No. 63 at 6.  But of course, the fact that Plaintiffs, who admit that they are sophisticated, counseled entities, *id.* at 1–2, chose not to negotiate the Confirmation's structure does not render the structure irrelevant.  *See, e.g.*, *Hasco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984); *see also Clopay Plastic Prods. Co., Inc. v. Excelsior Packaging Grp., Inc.*, 2014 WL 4652548, at *4–5 (S.D.N.Y. Sept. 18, 2014).

Approved Projects did not issue carbon credits for years or decades, Aspiration's remedy was to extend the agreement for years or decades. *See, e.g.*, Gagliano Dep. Tr. at 105:24–106:22.

Aspiration contends, Dkt. No. 64 at 3, that the Court must construe the Confirmation, the ISDA Agreement, and the Equity Pledge Agreement as an integrated whole because each agreement refers to and incorporates the other,[20] and that Plaintiffs' interpretation renders entire sections of the agreements illusory. It notes, Dkt. No. 65 at 7–8, that (1) the Confirmation requires ZCH to "deliver or cause to be delivered" "Carbon Credits" on each of two separate Physical Settlement Dates; and (2) the Physical Settlement 1 Date is defined to mean "the earlier of: (x) each date on which Carbon Credits are issued by the Registry . . . during the Physical Settlement 1 Calculation Period; and (y) December 31, 2022," Dkt. No. 35-2 at 2. In Aspiration's view, Dkt. No. 64 at 7, the deadline of December 31, 2022 (or the extended date of March 31, 2023) would be illusory and meaningless if ZCH's only obligations were limited to delivering credits issued by the Registry and to exercising "good faith efforts to diligently develop and operate the Approved Projects" as the Confirmation already requires in a separate provision, Dkt. No. 35-2 at 7. That objective would already be accomplished by the first clause of the provision regarding "Physical Settlement 1 Dates," which provides that the Physical Settlement Date includes the date on which carbon credits are issued by the Registry and gives

---

[20] The Confirmation contains an integration clause providing that it "shall supplement, form a part of, and be subject to, an agreement in the form of the 2002 ISDA Master Agreement as published by the ISDA." Dkt. No. 35-2 at 1. The ISDA Agreement provides that the parties had entered "into one or more transactions . . . that are or will be governed by this 2002 Master Agreement, which includes," *inter alia*, "the documents and other confirming evidence (each a 'Confirmation') exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions." Dkt. 35-1 at 1. "In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant transaction." *Id.* The Confirmation and Equity Pledge Agreement also reference each other. *See* Dkt. No. 35-2 at 5; Dkt. No. 35-3 at 1.

Aspiration all right, title, and interest to those credits on the moment they are issued by the Registry. The obligation to deliver carbon credits by the Physical Settlement 1 Date would be meaningless and rendered illusory if ZCH could avoid delivering the credits by December 31, 2022, by simply waiting out the clock until after December 31, 2022. Dkt. No. 64 at 7–8. Aspiration contends that including two Physical Settlement Dates, rather than just one, must have been meant to accomplish something, and it asks the Court to infer that such something was the obligation to deliver 3,600,000 carbon credits by December 31, 2022 and the remaining 2,955,556 carbon credits by the Termination Date of September 30, 2024. *See* Dkt. No. 64 at 3.[21]

Defendant also points to the provisions for an extension of the December 31, 2022 deadline, the Collateral provision, the Termination Date of September 30, 2024, and the terms of the Equity Pledge Agreement, as further support for its interpretation. Under Plaintiffs' proposed interpretation, the only scenario that would constitute an "Event of Default" and trigger Aspiration's right to exercise its rights outlined in the "Collateral" provision of the Confirmation would be when carbon credits are issued by the registry but not delivered to Aspiration. But the Collateral in the final Confirmation, which, as noted *supra*, was subject to significant negotiation, *see, e.g.*, Trial Tr. at 154, is defined to permit Aspiration to "control and operate project activities in accordance with [ZCH's] status as Project Developer" as "security for the prompt and complete performance when due" of ZCH's obligations under the Confirmation, Dkt. No. 35-2 at 5. There would be no occasion for Aspiration to exercise its rights in the Collateral,

---

[21] The Court rejects the notion that Plaintiffs believed that the two Physical Settlement Dates were based on Aspiration's internal tax planning and not on when Aspiration needed delivery because it is controverted by evidence which shows, *inter alia*, that Plaintiffs were aware of Aspiration's World Cup bid and sought to include the two Physical Settlement Dates into the Confirmation for that purpose. *See, e.g.*, Rogers Dep. Tr. at 28:02–12.

and the Collateral would therefore cease to have any function, if the only obligation ZCH had was to deliver carbon credits that had already been issued.  The reason that Aspiration sought during the negotiations the collateral provision entitling it to operate the projects was to ensure that it could secure issuance of the carbon credits if Plaintiffs failed to do so, and the reason why it obtained rights in excess of the 6,555,556 carbon credits for which ZCH was obligated was to cover the expense Aspiration would incur in operating the projects to ensure the issuance of the bargained-for carbon credits.  Trial Tr. at 193–94.

Aspiration further argues that under ZCH's proposed interpretation, the Termination Date would have no meaning.  Dkt. No. 64 at 7–8.  If ZCH's only obligation was to exercise "good faith efforts" and the only effect of the Termination Date was to relieve ZCH of any continuing obligation to deliver the 6,555,556 carbon credits, there never would be a circumstance when Aspiration would not extend that date and thus no reason for its existence whatsoever.

Finally, Aspiration argues that the purpose of the Equity Pledge Agreement was to permit Aspiration to step into the shoes of 413 as the project developer of the Approved Projects and to run the projects and enjoy revenue generated from them while an Event of Default has occurred and is occurring.  Dkt. No. 64 at 10.  There would be no reason for the Equity Pledge Agreement if ZCH's only obligation was to deliver carbon credits after they had been issued by VERRA, and not to facilitate the issuance of those carbon credits.  Aspiration argues that ZCH's obligation to "cause to be delivered" carbon credits carried with it an obligation to take the measures necessary for the requisite carbon credits to be issued in order to be delivered by each of the Physical Settlement Dates and that the provision of the Confirmation regarding "Carbon Credits" is not a condition precedent but merely defines the type of carbon credits ZCH is obligated to deliver.

38

There is no single interpretation of the transaction documents that can honor the rules of contract interpretation and give meaning to every term and provision such that the Court can give meaning to the parties' intent from the language that they used.  The definition of Physical Settlement 1 Quantity, particularly when viewed in isolation, can be read to suggest that ZCH had no obligation to deliver carbon credits unless they were issued by VERRA.  That reading would have been all the more forceful and convincing had there not been two Physical Settlement Dates and had the Confirmation simply provided that, in exchange for $29.5 million, ZCH was required to deliver 6,555,556 carbon credits "issued by the Registry and generated by either of the two Approved Projects."  In those circumstances, the Court almost assuredly would have interpreted the Confirmation solely to impose a duty of good faith upon ZCH to develop the Approved Projects such that they were able to generate carbon credits that would be issued by the registry.  *See* Dkt. No. 35-2 at 7; *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (1917) (Cardozo, J.).  But, on its face, the obligation to deliver carbon credits is not stated in the form of a typical condition precedent.  *See Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) ("While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'" (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 660 N.E.2d 415 (N.Y. 1995))).[22]  And conditions precedent are not readily assumed.  *Bank of N.Y. Mellon Tr. Co.*, 821 F.3d at 305.

---

[22] The parties here knew how to use the language of a condition precedent if they intended one. The Equity Pledge Agreement itself contains a number of conditions precedent.  It provides that "upon the occurrence and during the continuance of an Event of Default," Aspiration would have the right to be substituted for 413 as the sole member of ZCH, Dkt. No. 35-3 at 6, and that "[i]f an Event of Default shall have occurred and be continuing," certain consequences would follow, *id.* at 7.  That is the language of a condition precedent.  As the Second Circuit has recognized, language "such as 'if,' 'on condition that,' provided that,' 'in the event that,' and 'subject to'"

Moreover, the Confirmation cannot be read in isolation.  *See, e.g.*, *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 95 (2d Cir. 2023); *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011), Plaintiffs' interpretation would render illusory the two Physical Settlement Dates (and the deadlines contained therein), as well as the Collateral and Termination Date provisions of the Confirmation, and Equity Pledge Agreement.  The contract is thus ambiguous.

Where, as here, the intent of the parties is not clear and unambiguous from the contract language they used, the Court may turn to parol evidence, *see, e.g.*, *Curry Rd. Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990), to determine "the intent of the parties, as evidenced by the circumstances surrounding execution of the contract," *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 25 (2d Cir. 1989).  It must examine "[t]he communications of the parties during the negotiation," *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 287 (2d Cir. 1999), as well as the party's post-execution conduct, *see, e.g.*, *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 329 (S.D.N.Y. 2019); *Creaven v. Erickson*, 2022 WL 2643500, at *8 (E.D.N.Y. Mar. 24, 2022); *Evans v. Deposit Cent. Sch. Dist.*, 123 N.Y.S.3d 1081 (2d Dep't 2020); *Ames v. County of Monroe*, 80 N.Y.S.3d 774, 778 (4th Dep't 2018); *Myers v. City of Schenectady¸* 665 N.Y.S.2d 716, 718 (3d Dep't 1997).[23]

---

are conditions precedent.  *Bank of N.Y. Mellon Tr.*, 821 F.3d at 306 (quoting *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008)); *see also JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 101 (2d Cir. 2024).

[23] Industry custom and usage is also relevant parol evidence.  *See, e.g.*, *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 466; *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006).  Plaintiffs offered the expert testimony of Lucia Aragao, over objection, that "issuance of the credits is a typical condition precedent to the transfer of credits from one party to another."  JX 2 ¶ 9.  The Court initially reserved judgment on Defendant's objection, and now sustains the objection.  Moreover, even if the testimony were admissible, the Court would not accord it any weight.  Aragao is not competent to testify to standard terms in a prepaid forward contract for carbon credits governed by United States law.  She has never advised clients with

The parol evidence supports Defendant's interpretation that ZCH had an obligation to deliver 3.6 million carbon credits generated by one of the two Approved Projects and issued by VERRA by the extended date of March 31, 2023, or else be in default.  During the first phase of negotiations, the intent of the parties, as reflected by their communications, was that Plaintiffs would deliver 6.6 million carbon credits generated by ZCH #2 and issued by VERRA to Aspiration by no later than September 30, 2024 in exchange for a prepayment by Aspiration of $29.5 million.  The commitment was unconditional.  ZCH assumed the risk that its project, ZCH #2, would fail to generate 6.6 million carbon credits or that such credits would not be issued by VERRA.  *See* JX 16 (email of Lee explaining that "there is collateral from which we can settle with as of the Termination Date September 30, 2024, so whatever net amount of credits below the 6.5mm we're contracting for that they haven't delivered by that point, we can settle with either replacement credits or cash").  The parties' intent with respect to risk allocation is apparent from the communications as well as by the draft confirmations they exchanged.  The first draft agreements exchanged between the parties, which Lee credibly testified reflected the understandings of the parties, Trial Tr. at 215, provided that ZCH would deliver carbon credits in the "Quantity," defined as 6,555,556 carbon credits, by no later than the Termination Date, on pain that if such credits were not delivered, Aspiration would acquire "Replacement Credits" or "Collateral Credits" (or cash) in an amount to cover any shortfall in delivery, JX 13; JX 14.  In those early draft Confirmations, as in the final Confirmation, "Carbon Credits" was defined as

---

respect to American contract documents and is not licensed in any states in the United States, Trial Tr. at 106, she testified that the terms of prepaid forward contracts differ from one another, *id.* at 107, and that she is not rendering any opinion with respect to whether the agreements in this case contain conditions precedent, *id.* at 108.  She testified that all that she intended to say in paragraph nine of her declaration when she referred to "condition precedent" was that a credit could not be transferred by the VERRA registry until it was issued.  *Id.* at 111–12.

"carbon credits issued by the Registry and generated by the Approved Project," JX 14–15, but there is no credible argument that such definition was intended to act as a condition precedent or anything other than a definition.  Lee testified credibly, and the evidence supports, that the focus of the conversations between the parties in the first phase was on the nature and quality of the carbon credits.  Trial Tr. at 205, 209.  It made a difference to Aspiration, and was a critical component of the consideration it would receive in the transaction, that the credits be generated from ZCH #2 and that they be issued by VERRA.  Indeed, Lee testified that the "credits would be [virtually] worthless" if they were not on the VERRA registry.  *Id.* at 235.

The view that ZCH's obligation to deliver carbon credits by the Termination Date was not contingent upon a condition precedent is further supported by other contemporaneous communications between the parties and by the testimony.  In the very first email exchange regarding the sale of carbon credits from the ZCH #2 project, Hayden, in response to a question from Aspiration regarding the pricing of the credits on January 5, 2022, stated that the price would be "$4.50 per credit" with "up to 6.67 million credits available for pre-purchase."  JX 12.  When Aspiration responded that it would like to make "payment upon delivery," Hayden—who was acting as Plaintiffs' agent—responded that Plaintiffs need capital "to complete their projects" and that "[t]he transaction calls for payment now and delivery of carbon credits on or before September 30, 2022, with a requisite number of credits from the 413 [Environmental] project (to be issued in the next 60 days) to provide principal protection on your pre-purchase." *Id.*  Lee, who was not involved in the later negotiations, Trial Tr. at 232, but who was the principal negotiator for Aspiration in the first phase, testified credibly and without contradiction, that it was his understanding at the time of the negotiations, that Plaintiffs had an obligation to deliver the 6.6 million credits by the Termination Date of the Confirmation, *id*. at 240.

By January 28, the discussions between the parties had evolved to the point where ZCH was offering to deliver the carbon credits from ZCH #2 on each of two Physical Settlement Dates, with the earliest date concluding by December 31, 2022 at the latest.  *See* JX 16; JX 17. But there is no evidence that the parties intended the revised Confirmation to shift to Aspiration the risk that the carbon credits would not be generated by ZCH #2 or issued by VERRA, rather than that, if Aspiration agreed to accelerate its prepayment, ZCH would accelerate its delivery of at least a portion of the carbon credits.  *See, e.g.*, JX 16 (email of Lee explaining that "there is collateral from which [Aspiration] can settle with as of the Termination Date September 30, 2024, so whatever net amount of credits below the 6.5mm we're contracting for that they haven't delivered by that point, we can settle with either replacement credits or cash").  The January 28 draft Confirmation, which Plaintiffs signed but Defendant did not, contained substantially the same definition of "Physical Settlement Quantity" that appears in the final Confirmation. *Compare* JX 16 and JX 17, *with* JX 36 and Dkt. No. 35-2.  The evidence, including contemporaneous emails exchanged during the negotiations, reflects that such language was added by Defendant to guard against "underdelivery [sic] in the first year" and ensure "more certainty around . . . tonnage for the world cup."   JX 16.  Based on ZCH #2's feasibility assessment, which "suggest[ed] [that] a reasonable estimate for the first issuance [was] 3.6million [sic]" credits, Aspiration negotiated into the Confirmation provisions that would ensure that it received a minimum of 3.6 million carbon credits by December 31, 2022.  *Id*. Rogers testified at deposition that he understood the structure was intended to ensure that Aspiration received at least some of the carbon credits as soon as possible.  Rogers Dep. Tr. at 40:20–24.

It is fair to infer, and the Court thus finds, that the parties intended and understood that the proviso capping ZCH's obligation to 3.6 million carbon credits in 2022 was worded to protect ZCH in the event that the ZCH #2 project generated more than 3.6 million carbon credits before December 31, 2022.  It was expected by all parties that ZCH #2, and certainly ZCH #2 and ZCH #1 together, would generate far more than 3.6 million carbon credits before year-end 2022.  *See, e.g.*, JX 34.  The proviso was intended to ensure that, notwithstanding the otherwise applicable requirement to deliver carbon credits on each date that they were issued by the Registry, and at the latest December 31, 2022, ZCH would have no obligation to deliver more than 3.6 million credits by December 31, 2022.  It was not intended to otherwise limit ZCH's obligations to deliver carbon credits.

The "Physical Settlement 1 Date" definition in the draft confirmations and the final executed version was not aspirational or merely hortatory.  The Confirmation defined the "Period 1 Amount" as "3,600,000 Carbon Credits."  JX 17.  The collateral provision in the January 28 draft, included in a section headed "Collateral Credits or Cash Settlement," guaranteed that, if ZCH failed to deliver that amount of 3.6 million credits by the December 31, 2022 date, Aspiration would be entitled to collateral credits or cash to compensate for ZCH's failure to timely deliver.  JX 16; JX 17 at 6–7 ("If, by the last day of each Physical Settlement Calculation Period, Carbon Credits equal to the Period 1 Amount or Period 2 Amount, as applicable, have not been delivered to Buyer during the relevant Physical Settlement Calculation Period, the Buyer shall 1) acquire all right, title and interest in and to the number of Collateral Credits that, when added to the number of Carbon Credits delivered to Buyer during such Physical Settlement Calculation Period is equal to Period 1 Amount or Period 2 Amount, as applicable (the amount

of such Collateral Credits, the 'Shortfall Amount') or 2) if Buyer so elects, be paid an amount in cash equal to the Shortfall Amount's cash value." (emphasis omitted)).

After January 28, and after Shuckerow became involved, the form of Aspiration's protection changed from escrow, to escrow and collateral in the form of control rights to the projects, to finally just a "contingent control interest," but the mutual understanding of the parties regarding risk allocation remained the same: that Plaintiffs would bear the risk of the failure of the projects to generate carbon credits and the failure of VERRA to issue carbon credits. This conclusion is only reinforced by the evidence of the communications between the parties. The February 7 draft confirmation delivered by Aspiration to Plaintiffs retained the section providing for an escrow to be funded in the first instance by carbon credits generated by the 413 Environmental project and by cash if such credits were not sufficient, and which would be released to Aspiration if ZCH failed to deliver carbon credits fewer than 3.6 million credits by December 31, 2022 at the latest, but it also had a collateral provision giving Aspiration the right to control ZCH's reforestation programs generating carbon credits as security for ZCH's failure to perform. JX 22. Those provisions plainly placed the risk of non-delivery on Plaintiffs. If Plaintiffs failed to deliver the requisite carbon credits by the relevant Physical Settlement Date then (after a short cure period), Aspiration would acquire "all right, title and interest in and to the Escrow Credits and any Escrow Cash." *Id.*

Plaintiffs did not object to the escrow provisions on the basis that those provisions placed the risk that the Projects would fail to deliver or that VERRA would fail to issue the credits on ZCH. Plaintiffs objected because the escrow provisions restricted 413's finances (by requiring 413 to deposit cash to make up for any escrow credits that had not yet been generated), which was a reason why Plaintiffs were willing to sell carbon credits on a discounted basis. JX 20.

Plaintiffs' silence with respect to the consequences of a failure to deliver is telling.  The Court finds credible Shuckerow's testimony that Aspiration insisted on control rights to the projects in the event of a default in order to protect against the risk that the ZCH #2 Project, and as later added, the ZCH #1 Project, would fail to generate carbon credits, or that VERRA would fail to issue the credits, that he expressed that reasoning to Plaintiffs, and that it was the shared understanding of Plaintiffs and Defendant that ZCH had an unconditional obligation to deliver 3.6 million credits by December 31, 2022 or the extended date of March 31, 2023.  Trial Tr. at 191–92.  Had Plaintiffs believed that they did not have an unconditional obligation to deliver 3.6 million credits by those dates, they would have said so.

That testimony is corroborated by contemporaneous evidence of the parties' communications.  First, Rogers's February 2 email to Sanberg acknowledges that the draft agreement Plaintiffs had agreed to sign was cross-collateralized and committed 413 "to deposit cash in escrow upon issuance [of the Confirmation] to offset any future issuance delay."  JX 19.  And Sanberg's email response to Rogers that same day indicated that Aspiration might be "willing to give on the Escrow trust to [ZCH and 413's] preferred model if Aspiration gets the contingency controlling interest in their [three] projects if they fail to deliver."  *Id.*  The only reasonable inference that can be drawn is that the parties were discussing the failure of the projects and of VERRA to issue the carbon credits.

The inference that the parties all understood that ZCH was obligated to deliver 3,600,000 credits by the "Physical Settlement 1 Date," and that the risk of the failure to deliver fell on Plaintiffs, is further supported by both the amount of time and attention the parties subsequently spent on the form of controlling interest that Aspiration would receive upon default, and the reasons offered by Aspiration as to why it needed those controlling interests.  The email

correspondence between the parties during the negotiations makes abundantly clear that the parties understood that there would be an "Event of Default" if the projects failed to produce the requisite number of carbon credits by the first Physical Settlement Date, and such default entitled Aspiration to take control of ZCH #1 and ZCH #2.  For example, in Shuckerow's February 6 email response to Rocha regarding the nature of the controlling interests Aspiration would receive in the event of a default, Shuckerow explained that Aspiration "would need significant rights to step in and run the project and have rights to enough credits to cover our costs in doing so," as security against the failure of ZCH to perform (and in the event that Aspiration did not get a cash escrow).  JX 25.  Aspiration would not have needed those rights, and it would never have took steps to exercise those rights and incur costs in doing so if the only risk and the only "Event of Default" was ZCH's failure to deliver carbon credits that had been already generated by the projects and issued by VERRA.  The executed Confirmation gave Aspiration right, title and interest to the carbon credits issued by the registry immediately upon issuance regardless of whether Plaintiffs gave the instruction to VERRA to deliver the credits.  *See* Dkt. No. 35-2.  The reason that Aspiration sought a contract provision entitling it "to step in and run the project[s]" and "have rights to enough credits to cover [the] costs in doing so" was to ensure the projects generated carbon credits issued by VERRA; there would be no reason for Aspiration to step in and to run the projects (and get compensated for doing so) if the projects in fact generated the credits, and the only issue was that ZCH did not deliver them.  JX 25.  As Rogers averred in his deposition, "there was a threat that [413 and ZCH] were not going to deliver," and the collateral provision ensured that Aspiration "could step in, make sure they got their 8.5 or so million credits."  Rogers Dep. Tr. at 46:19–47:23.  The parties' understanding, and Aspiration's desire to protect itself from the threat of non-delivery, was made even more clear by Lawler in his

response to Shuckerow's February 6 email, in which he summarized the phone conversation the parties had had: the purpose of the collateral was "simply to provide Aspiration with the ability to satisfy the obligations owed to it by providing a controlling right in the projects if the project vehicles do not produce sufficient credits and the escrow is otherwise under-capitalized."  JX 26.

Moreover, Lawler's email of the evening of February 7, 2022, establishes that the parties had a mutual understanding within 26 hours of the Confirmation being signed that ZCH would have a "[d]elivery obligation[]" of "[a]t least 3.6MM ZCH #2 credits by December 31, 2022 (as may be extended until March 31, 2023 at the latest by mutual agreement of the parties not to be unreasonably withheld)."  JX 31.  Tellingly, Plaintiffs did not object to Lawler's summary of that conversation between the parties and thus can be deemed to have adopted it.  *See, e.g.*, *United States v. Tyrell*, 840 F. App'x 617, 623 (2d Cir. 2021) (summary order) ("An individual can manifest an intent to adopt an admission through silence."); *see also In re Adelphia Recovery Tr.*, 634 F.3d 678, 692 (2d Cir. 2011) ("[R]atification may be express or implied or may result from silence or inaction." (quoting 57 N.Y. Jur.2d 88)).

There would have been no reason for Plaintiffs to have requested on February 8 that credits that were not delivered by December 31, 2022 be rolled over to the "next settlement period" if Plaintiffs had not understood that, but for a rollover provision, Plaintiffs had an unconditional obligation to cause to be delivered 3.6 million carbon credits.  JX 34.  Defendant's rejection of that proposal on the eve of the parties' execution of the Confirmation and Plaintiffs' agreement to accept an "extension option" in lieu of the rollover further corroborates that mutual understanding.  Lawler explained that Aspiration could not agree to the rollover because it needed actual credits, not just security against the risk that credits would be available but not delivered.  JX 34.  The accommodation that Aspiration offered instead of the rollover—the extra

ninety day extension period—was, as Defendant explained to Plaintiffs at the time, intended to allow "more than enough time for the projects to produce under the timelines [Plaintiffs had] provided."  JX 34; *see* Rogers Dep. 41:08–42:02 (describing the extra ninety days as a contingency "in case something went wrong" and Plaintiffs could not deliver the credits by the December 31, 2022 date).

Finally, to the extent further evidence of the shared understanding of the parties is necessary, it is supplied by their post-execution conduct and statements.  *IBJ Shroder Bank & Tr. Co. v. Resol. Tr. Corp.*, 26 F.3d 370, 374 (2d Cir. 1994), *cert. denied*, 514 U.S. 1014 (1995).  In May 2022, Rogers did not object to Hayden's statement that ZCH owed Aspiration 3.6 million carbon credits in 2023.  JX 40.  And on January 25, 2023, after the passage of the original December 31, 2022 deadline, Plaintiffs offered Defendant two options for how to proceed "[g]iven the current status of the ZCH #2 project," one of which was that Defendant could have all rights to the ZCH #1 project (which was estimated to yield 13,705,917 carbon credits) subject to an agreed-upon payment for credits in excess of the 8,522,223 referenced in the Collateral provision of the Confirmation, JX 48, an offer that would have made little sense but for an understanding on the part of Plaintiffs that they had fallen short of their obligation to make "prompt and complete performance when due" of its obligations under the Confirmation and thus that Defendant was entitled to the collateral.  Lastly, in their interrogatory responses, Plaintiffs took the position that "by the terms of the Letter Confirmation, there could be no default for non-delivery until, at the very earliest, September 30, 2024."  JX 52 ¶ 7.  But, if Plaintiffs' litigation position is to be believed, there could never be a default for failure to deliver carbon credits that had not yet been issued.  At a minimum then, Plaintiffs' own interrogatory

response undermines the view that Plaintiffs had, at the time of contracting, an understanding of the obligations of the Confirmation different from that to which Defendant testified.[24]

Plaintiffs' point to Rogers's sworn statements, made after litigation began, that Aspiration agreed to the mere *possibility* of receiving carbon credits.  *See* JX 1 ¶¶ 23–26.  But courts have repeatedly given little weight to "*post hoc* rationalization[s] developed specifically for this litigation" to explain pre-litigation conduct.  *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *28 (S.D.N.Y. Oct. 13, 2021); *see, e.g.*, *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 306 n.10 (S.D.N.Y. 2010), *aff'd*, 839 F.3d 125 (2d Cir. 2016) (explaining that "post-hoc statements" of "witnesses as to their subjective interpretations of the contract . . . are most often self-serving, and of little value to the Court's present analysis"); *CCR Int'l, Inc. v. Elias Grp., LLC*, 2020 WL 7629325, at *12 (S.D.N.Y. Dec. 22, 2020); *see also N.Y. Univ. v. Factory Mut. Ins. Co.*, 347 F. Supp. 3d 315, 332 (S.D.N.Y. 2019).

---

[24] Indeed, Rogers's failure to respond to a direct question from counsel regarding whether Plaintiffs ever consented to an unconditional obligation to deliver a minimum of 3.6 million credits by December 31, 2022, is almost as telling on paper as it was hearing it live:

> Q.    At any point did you ever have a discussion with the other side where ZCH agreed that it would unconditionally deliver a minimum of 3.6 million carbon credits by December 31, 2022.
>
> A.    Our intention was always to deliver the credits as we said—it was as—as was defined in the agreement that were issued by the registry as soon as possible. From our standpoint, it we could have given them all 6 and a half million as soon as they were issued and be done with this it would have been great.
>
> But they are the ones that insisted on breaking this up into two different quantities. As I said, our intention was always to deliver them as soon as possible.

Trial Tr. at 87.

**II.      Plaintiffs' Defense of Impossibility and Impracticability of Performance**

Plaintiffs next argue that, even if they had an obligation to deliver 3.6 million carbon credits by March 31, 2023, they are relieved of the consequences of the failure to satisfy that obligation under the doctrines of impossibility and/or impracticability.  Dkt. No. 35 ¶¶ 105–106; Dkt. No. 63 at 8.  They contend that they were unable to secure issuance of the credits due to unforeseeable events beyond their control, including (1) severe political turmoil in Brazil in advance of, and subsequent to, the elections that froze the application process in Brazil; (2) low river levels that rendered travel to the sites impracticable; and (3) dramatic and unanticipated rule changes in the VERRA verification process that caused significant delays to issuance of carbon credits.  Dkt. No. 63 at 8.

"Impossibility, also known as 'impracticability,' is an affirmative defense under New York law against liability for nonperformance of a contractual obligation."  *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 153–54 (2d Cir. 2023) (citing *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir. 2018) and *Knickerbocker Retail LLC v. Bruckner Forever Young Soc. Adult Day Care Inc.*, 167 N.Y.S.3d 462, 464 (1st Dep't 2022)); *see also* Restatement (Second) of Contracts § 261 (1981); *Edge Grp. WAICCA LLC v. Sapir Grp. LLC*, 705 F. Supp. 2d 304, 318–19 (S.D.N.Y. 2010).  "Under New York law, '[i]mpossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible.'"  *Siemens Energy*, 82 F.4th at 153–54 (quoting *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)).  "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  *Id*.  "The defense is available to a party whose performance 'is made impracticable without [the party's] fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made.'"  *Id.* (quoting

Restatement (Second) of Contracts § 261 (1981)).  The New York Court of Appeals has cautioned, however, "that a defense to contract performance such as impossibility should be applied narrowly and only in extreme circumstances due in part to judicial recognition that the purpose of contract law is to allocate risks." *Gap Inc. v. Ponte Gadea N.Y. LLC*, 524 F. Supp. 3d 224, 237 (S.D.N.Y. 2021) (quoting *Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d 370, 383 (S.D.N.Y. 2013)) (citing *Kel Kim Corp.*, 519 N.E.2d at 295).

"[T]he purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances."  *Kel Kim Corp.*, 519 N.E.2d at 296.  Thus, "the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  *Id.*; *BOCA Aviation Ltd. v. AirBridgeCargo Airlines, LLC*, 669 F. Supp. 3d 204, 232 (S.D.N.Y. 2023).  "Generally, however, the excuse of impossibility of performance is limited to the destruction of the means of performance by an act of God, Vis major, or by law."  *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37, 41 (N.Y. 1968); *see Ebert v. Holiday Inn*, 628 F. App'x 21, 23 (2d Cir. 2015) (summary order).  "To establish the defense of impossibility in this case, [Plaintiffs] must therefore show 'that [they] took virtually every action within its power to perform its duties under the contract,'" *Siemens Energy*, 82 F.4th at 154 (quoting *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990)), and that, despite those efforts, performance was "objectively impossible," *Kel Kim Corp.*, 519 N.E.2d at 296; *see also Inter-Am. Dev. Bank v. Nextg Telecom Ltd.*, 503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007) (burden is on party seeking to excuse performance).

Plaintiffs have failed to show that the failure to obtain carbon credits meeting the standard laid out in the Confirmation was unforeseen or could not be guarded against.  The evidence at trial established that ZCH # 1 was delayed by threats by local stakeholders, weather

challenges, and political unrest during Brazil's presidential election cycle.  Trial Tr. at 116–17; JX 2 ¶ 17; JX 1 ¶ 59.  ZCH #2 was also delayed by weather and environmental challenges.  Trial Tr. at 116–17; JX 2.  Rogers admitted at his deposition that it was understood by all parties that there was risk involved in the transaction.  *See* Rogers Dep. Tr. at 37:12–13.  Each of the issues that arose with respect to the transaction were issues that could foreseeably arise, even if not precisely in the way in which each issue ultimately manifested.  It was foreseeable that land issues, title, access and the like could arise during the course of the development of a carbon project in Brazil.  Trial Tr. at 112.  It was also foreseeable that political unrest and turmoil could happen in Brazil, particularly during an election cycle, and could derail the project.  *Id.* at 113–15 (acknowledging long history of political and social unrest in Brazil that had swelled in recent years); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *4 (S.D.N.Y. Nov. 18, 2019) (noting some of the past political turmoil in Brazil).  Indeed, well before the parties entered into the agreements here, there had been a long history of political and social unrest in Brazil.  Trial Tr. at 113.  And as Plaintiff's own expert agreed, it was also entirely foreseeable that there could be weather disruptions to the projects.  *Id.* at 116.  The feasibility reports themselves demonstrate that the risk that eventualized was risk that the parties anticipated might occur.  Each of the reports discusses political risk, risk of indigenous participation, and other risks.  JX 7; JX8.  And, as Plaintiffs allege in the operative complaint, "[i]ndustry participants . . . will typically consider many potential risks associated with such an investment, including environmental and geopolitical risks."  Dkt. No. 35 ¶ 41.  Accordingly, it would not have been a surprise to Plaintiffs, or to Defendant for that matter, that the projects required numerous steps to be completed before VERRA would issue credits and that they could fail at any one of those steps.  Rogers laid them out in his February 8 email.  *See* JX 34.  In fact, the question of whether the

projects would advance sufficiently such that VERRA would verify the carbon credits was the subject of extensive correspondence between the parties, with Aspiration expressing concern that VERRA might not verify the carbon credits in time for them to be delivered, and Plaintiffs providing assurances or "comfort" that the carbon credits would be verified.  *Id.*

The parties specifically accounted for the risk that the projects would not progress to the point where VERRA could issue carbon credits.  They drafted the security provisions of the Confirmation and the Equity Pledge Agreement to account for such risk and to place the risk of it on Plaintiffs, with Defendant entitled to relief if VERRA failed to issue sufficient carbon credits on a timely basis.  In that event, an "Event of Default" would occur, Aspiration would have the right to take over the Approved Projects, and Aspiration would receive sufficient carbon credits to cover not only ZCH's commitment to deliver 6,555,556 credits but also to cover the expenses that Aspiration would incur in managing the project.

On the whole, the record reflects that the parties understood that there was significant risk of delay of issuance of the credits by VERRA, and agreed to contract terms that placed the burden of that risk primarily on Plaintiffs.  Because the risks that plagued the projects were foreseeable, Plaintiffs cannot succeed on an impossibility or impracticability defense.  *Cf. Beardslee v. Inflection Energy, LLC*, 904 F. Supp. 2d 213, 221 (N.D.N.Y. 2012); *Dankrag, Ltd. v. Int'l Terminal Operating Co.*, 729 F. Supp. 360, 364–65 (S.D.N.Y. 1990); *Cliffstar Corp. v. Riverbend Prods., Inc.*, 750 F. Supp. 81, 85 (W.D.N.Y. 1990).

## III.    Plaintiffs' Defense of Frustration of Purpose

Plaintiffs further argue that they are relieved of the consequences of the failure to deliver by the doctrine of frustration of purpose.  Plaintiffs allege that the purpose of the Confirmation was to deliver carbon credits and that such purpose was frustrated by "challenges [that] could not reasonably have been foreseen by Plaintiffs and could not have been guarded against in the

Agreement" because VERRA has not yet issued any carbon credits in connection with the Approved Projects.  Dkt. No. 35 ¶¶ 42, 114–115. [25]

"The doctrine of frustration of purpose discharges a party's duties to perform under a contract where a 'wholly unforeseeable event renders the contract valueless to one party.'" *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018) (summary order) (quoting *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)); *see also Tycoons Worldwide Grp. (Thailand) Pub. Co., Ltd. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 203 (S.D.N.Y. 2010) ("[T]he doctrine of frustration of purpose . . . is not available where the event which prevented performance was foreseeable and provision could have been made for its occurrence." (quoting *Warner v. Kaplan*, 892 N.Y.S.2d 311 (1st Dep't 2009))); *Banco Santander (Brasil), S.A. v. Am. Airlines, Inc.*, 2021 WL 4820646, at *5 (E.D.N.Y. Oct. 15, 2021).  "In order to be invoked, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, the transaction would have made little sense."  *Reed v. Luxury Vacation Home LLC*, 632 F. Supp. 3d 489, 512 (S.D.N.Y. 2022); *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 839–40 (Bankr. S.D.N.Y. 2020); *see also* Restatement (Second) of Contracts § 265, Comment a (1981); *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F. Supp. 260, 266 (S.D.N.Y.), *aff'd sub nom., First Nat'l Bank of Md. v.*

---

[25] The ISDA Agreement also contains a *force majeure* clause, which seeks to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated."  *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985).  "Mere impracticality or unanticipated difficulty is not enough to excuse performance."  *Philbro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 318 (S.D.N.Y. 1989).  New York law provides that ordinarily, a *force majeure* clause must include the specific event that is claimed to have prevented performance.  *See id.* (citing *Kel Kim Corp.*, 519 N.E.2d at 296).  The event must also be unforeseeable.  *United States v. Brooks-Callaway Co.*, 318 U.S. 120, 122–23 (1943).  Here, the parties do not raise arguments regarding the effect of the clause, and the Court finds it inapplicable in any case.

*Envases Venezolanos, S.A.*, 923 F.2d 843 (2d Cir.1990) (explaining that the doctrine of frustration of purpose discharges a party's duties to perform where "an unforeseen event has occurred, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract, even though performance is possible").  "The event which allegedly frustrates performance must be both 'virtually cataclysmic' and 'wholly unforeseeable.'"  *Gap Inc.*, 524 F. Supp. 3d at 234 (quoting *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013), *aff'd*, 561 F. App'x 48 (2d Cir. 2014) (summary order)).

The doctrine of frustration of purpose is "a narrow one which does not apply unless the frustration is substantial."  *Crown It Servs. v. Koval-Olsen*, 782 N.Y.S.2d 708 (1st Dep't 2004). Importantly, the doctrine may not be invoked, and thus offers no defense to the enforcement of a contract, when "the terms of the contract impose the relevant risks on one of the parties."  *In re Condado*, 620 B.R. at 840; *In re NTS W. USA Corp.*, 2021 WL 4120676, at *4 (S.D.N.Y. Sept. 9, 2021), *aff'd*, 2022 WL 10224963 (2d Cir. Oct. 18, 2022) (summary order); *see, e.g.*, *Strauss v. Long Island Sports, Inc.*, 401 N.Y.S.2d 233, 238 (2d Dep't 1978).

Plaintiffs' frustration of purpose argument fails for largely the same reasons their impossibility and impracticability defense fails.  *See, e.g.*, 30 Williston on Contracts § 77:95 (4th ed.) (explaining that the defenses of impossibility of performance and frustration of purpose are not available "if the difficulties that frustrate the purpose of contract or make performance impossible reasonably could have been foreseen by the promisor when the parties entered into contract . . . if the event was reasonably foreseeable, the parties should have negotiated contract terms addressing its occurrence"); *605 Fifth Prop. Owner, LLC v. Abasic, S.A.*, 2022 WL 683746, at *4–5 (S.D.N.Y. Mar. 8, 2022), *aff'd*, 2023 WL 4417343 (2d Cir. July 10, 2023) (summary order); *In re NTS W. USA Corp.*, 2021 WL 4120676 (S.D.N.Y. Sept. 9, 2021); *Profile*

56

*Publ'g & Mgmt. Corp. APS v. Musicmaker.com, Inc.*, 242 F. Supp. 2d 363 (S.D.N.Y. 2003).  The proper inquiry is not whether Plaintiffs have taken all of the measures that they could have taken to ensure the verification of the carbon credits or whether the verification of those credits is out of their control.  Rather, "[t]he relevant inquiry is, 'whether the party seeking to avoid liability could have anticipated the frustrating event and guarded against it.'"  *Gander Mountain Co.*, 923 F. Supp. 2d at 360 (quoting *Sage Realty Corp. v. Jugobanka, D.D.*, 1998 WL 702272, at *4 n.4 (S.D.N.Y. Oct. 8, 1998)).  The parties anticipated that there might be circumstances where the verification of the credits were outside of their control.  *See, e.g.*, Gagliano Dep. Tr. at 92:11–94:06.  Plaintiffs never had control over the VERRA verification process or VERRA's specific verification standards.  *See, e.g.*, JX 2 ¶ 18; Trial Tr. at 113–17.  It thus was foreseeable that events might arise whereby VERRA would not issue the credits.

The Confirmation and Equity Pledge Agreement contemplated the risk of VERRA non-issuance and allocated that risk to Plaintiffs.  *Cf. Housman v. Media Tech. Corp. Ltd.*, 1996 WL 66121, at *4 (S.D.N.Y. Feb. 14, 1996); *Sage Realty Corp.*, 1998 WL 702272, at *3.  The agreements and the contemporaneous conversations surrounding their negotiation and execution contemplate that, if the deadline set forth in the Confirmation was not met, then Aspiration would have the right to declare an Event of Default.  The deadline set forth in the Confirmation was not met, and thus Aspiration declared default and sought to exercise its project-management rights under the Confirmation.[26]  The doctrine of frustration of purpose does not relieve Plaintiffs

---

[26] Plaintiffs argued in their pretrial memorandum that, even if they did default and Aspiration had a right to take over control of the projects, Aspiration was required to return control and all revenue and income from the projects after it had received the 6,555,556 carbon credits.  Trial Tr. at 63.  At trial, however, Plaintiffs indicated that the only declaration they sought was that an Event of Default had not occurred.  *Id.* at 249.  Accordingly, the Court does not address this issue.

of their obligations or deny Defendant the benefit of the contracted-for remedy if Plaintiffs failed to meet those obligations.

Even assuming that Plaintiffs failed to fully appreciate the risks that threatened their ability to obtain issuance of the carbon credits, *see* Rogers Dep. Tr. at 35:12–38:09, does not make them unforeseeable.  *See Sage Realty Corp.*, 1998 WL 702272, at *3.  As noted *supra*, the circumstances that prevented issuance of carbon credits were "within the contemplation of the parties at the time of the execution" and thus could "have been anticipated and guarded against." *Hungarian People's Republic v. Cecil Assocs., Inc.*, 127 F. Supp. 361, 363 (S.D.N.Y. 1955).

## CONCLUSION

For the reasons stated, the Court grants declaratory judgment in favor of Defendant, finding that an Event of Default has occurred due to Plaintiffs' failure to deliver 3,600,000 carbon credits as required by the Confirmation, which entitles Aspiration to exercise its rights contemplated by the Confirmation and the Equity Pledge Agreement.  Plaintiffs' claims are dismissed.


SO ORDERED.


Dated: May 1, 2024
      New York, New York                               LEWIS J. LIMAN
                                           United States District Judge